UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | |
|---|---|
| DR. CHRISTOPHER FROST ) <br>    Plaintiff ) <br> ) <br> v. ) <br> ) <br> UNIVERSITY OF LOUISVILLE; ) <br>    Serve: Registered Agent: Thomas A. Hoy ) <br>       University of Louisville ) <br>       Grawemeyer Hall, Suite 206 ) <br>       2301 S. Third Street ) <br>       Louisville, KY 40292 ) <br> ) <br> KIMBERLY KEMPF-LEONARD in her ) <br>    individual and official capacities; ) <br>      Serve: 519 Belgravia Court ) <br>      Louisville, KY 40208 ) <br> ) <br> LAURA SCHROEDER a/k/a Laura Carter in ) <br>    her individual and official capacities; and ) <br>      Serve: 1100 Fischer Ave ) <br>      Louisville, KY 40204 ) <br> ) <br> DONNA ERNST in her individual and official ) <br>    capacities; ) <br>      Serve: Thomas A. Hoy ) <br>      University of Louisville ) <br>      Grawemeyer Hall, Suite 206 ) <br>      Louisville, KY 40292 ) <br> ) <br>    Defendants ) <br> ) | Case No. 3:19-CV-227-RGJ <br><br><br><br><br><br><br><br><br><br><br><br><br> **VERIFIED COMPLAINT, PETITION FOR DECLARATION OF RIGHTS, AND REQUEST FOR INJUNCTIVE RELIEF** |

## NATURE OF THE ACTION

1. This is an action for injunctive relief, compensatory and punitive damages, as well as a petition for a declaration of rights brought by the plaintiff, Dr. Christopher Frost, against the University of Louisville and each of the named individual defendants in their official and

individual capacities. Dr. Frost has protected property and liberty interests and the defendants have deprived him of those interests without due process of law. The defendants' conduct is the proximate cause of irreparable harm to Dr. Frost and warrants injunctive relief as well as compensatory, and punitive damages.

2.  Dr. Frost is a tenure-track Assistant Professor of Biology in the College of Arts & Sciences at the University of Louisville. He has a contract of appointment with the University. He can only be removed for cause as defined by the University's Redbook. He is responsible for the management of a research lab and for the work of graduate students and undergraduate students who are conducting research, publishing articles in the field of biology, and undertaking academic speaking engagements. Dr. Frost's oversight and operation of his lab as well as his interactions with his students and co-faculty members are necessary to his scholarship and standing in the academic community. As a result, Dr. Frost has property interests that are protectable under the Due Process Clause of the Constitution. Dr. Frost also has a protectable liberty interest in his reputation, good name, honor and integrity.

3.  The University knows that it must provide adequate due process to professors with protectable interests. Nevertheless, in contravention of clearly established law, the University inquiries into complaints of sexual harassment by conducting interviews. The accused has no opportunity to cross-examine his accuser or any other person whom the University, acting through two HR employees, chooses to interview. Quite the opposite is true. The accused is expressly prohibited from questioning the accuser or any other interviewee or witness. The University's sexual harassment policy embodies this model of inquiry which is implemented by two HR employees in the Employee Relations and Compliance Office of the University. A copy of the sexual harassment policy is attached as **Exhibit 1.**

4. The University employs this model even when faced with competing narratives and when a determination will turn entirely on credibility. Every time this inquiry model is used by the University with respect to a faculty member who has protectable interests, it violates that faculty member's due process rights. Dr. Frost is one of those faculty members.

5. While an accused who is found guilty may seek reconsideration from the same office that conducts the investigation, reconsideration will be denied unless the application is supported by affidavits or other written documentation that would "substantially alter the findings of the investigation." The end result of the investigatory process is a "case summary report" that is published to the accuser, the accused faculty member and the "appropriate administrators for the purpose of rendering any disciplinary action (as appropriate) that is deemed necessary." A copy of the report is also sent to the University provost. The results of the investigation "are not subject to the appeal process."

6. The University, Schroeder, Ernst and Kempf-Leonard subjected Dr. Frost to an investigation of a sexual harassment complaint in accordance with its unconstitutional sexual harassment policy. Schroeder and Ernst interviewed the accuser, other "witnesses," and Dr. Frost. Yet, no third party witnessed the alleged events. Other than evidence of the accuser's effort to follow Dr. Frost on social media after her allegations were lodged, Ernst and Schroeder did not possess any other objective evidence. As a result, the matter turned entirely on credibility determinations.

7. At the end of the investigation, Ernst and Schroeder were unable to find that any sexual misconduct took place. They were unable to find that any conduct of a sexual nature occurred. Nevertheless, they concluded that Dr. Frost had violated the University's sexual

3

harassment policy, authored a report to that effect, and published it to Dean Kempf-Leonard on January 14, 2019.

8.  On January 15, 2019, Dr. Frost notified the Employee Relations personnel and Dean Kempf-Leonard that he would be seeking reconsideration. He also sought clarification as to any pending deadline for submission of his material in support of reconsideration. Schroeder advised there was no deadline. Before Dr. Frost could submit his request for reconsideration, on January 28, 2019, Kempf-Leonard deemed him "*persona non gratis,*" banned him from campus, relieved him of all of his job duties, and barred him from communicating with his students. This action followed.

## THE PARTIES, JURISDICTION, AND VENUE

9.  Dr. Frost is a resident of Jefferson County, Kentucky. At all times pertinent to this matter, Dr. Frost was a tenure-track Assistant Professor of Biology in the College of Arts and Sciences at the University of Louisville.

10. The University of Louisville is a nonprofit Kentucky corporation doing business in Louisville, Jefferson County, Kentucky; a Kentucky institution of higher learning per KRS 164.810; and a state agency.

11. Kimberly Kempf-Leonard is the Dean of the College of Arts and Sciences at the University of Louisville and is partially or wholly responsible for the injuries to Dr. Frost as set forth below.

12. Laura Schroeder a/k/a Laura Carter is an EEO – Employee Relations Specialist at the University of Louisville and is partially or wholly responsible for the injuries to Dr. Frost as set forth below.

13. Donna Ernst is an Employee Relations Manager at the University of Louisville and is partially or wholly responsible for the injuries to Dr. Frost as set forth below.

14. Subject matter jurisdiction is proper in this Court because this action arises under the Fourteenth Amendment to the Constitution of the United States and is brought pursuant to 42 U.S.C. §§1983 and 1988.  This Court also has personal jurisdiction over the parties.

15. Venue is proper because Dr. Frost resides in Jefferson County, Kentucky; the University is located in and performs its official duties and conducts business in Jefferson County; and the injuries in question occurred in Jefferson County, all of which are within the above-captioned judicial district.

## FACTUAL ALLEGATIONS

16. Dr. Frost incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

17. Dr. Frost received his Ph.D. in Ecology from the University of Georgia in 2005.

18. On March 13, 2015, the University of Louisville ("University" or "U of L") offered Dr. Frost an appointment to its faculty in the Biology Department of College of Arts & Sciences, Louisville, Kentucky. Dr. Frost accepted the offer and thereby obtained an appointment.  A copy of the offer is attached hereto as **Exhibit 2**.

19. The University recognized that running a research laboratory was necessary to Dr. Frost's scholarship and to maintaining his standing in academia.  Accordingly, the terms of Dr. Frost's contract included $190,000 to be used to purchase equipment and otherwise establish a research laboratory.  Moreover, equipment purchased by Dr. Frost was for his exclusive use.

20. Over the course of his three-year tenure at the University, Dr. Frost has supervised the work of graduate and undergraduate students.  Prior to being banished from

5

campus, Dr. Frost was supervising the laboratory research, article-writing and other post-graduate work of three graduate students, one post-doctoral scientist, and eight undergraduate students, all of whom work in the laboratory created by Dr. Frost. The students and Dr. Frost work as a team on research, holding weekly meetings to discuss the status of their on-going projects, including those the results of which they anticipate will be published.

21. In 2017, the National Science Foundation awarded Dr. Frost in excess of $700,000 for use in his on-going research (the "Grant"). In connection with Dr. Frost's first Merit Review, then Department Chair Ronald Fell stated that Dr. Frost's "recent news of major NSF funding puts him among a select group of Department faculty." 03/18/17 Merit Evaluation, **Exhibit 3.** Dr. Fell also stated "The merit bar has been increasing quickly in the Biology Department and due to faculty like Chris making these major funding and publication contributions." And, "Chris is also on his way to developing an excellent research program." *Id.* The NSF grant was significant not only to the Biology Department and the University but also to Dr. Frost's standing in the academic community and his ability to obtain future grants, which in turn, is necessary to his scholarship and research.

22. Upon his second merit review, the Biology Department ranked Dr. Frost "Highly Proficient." He was also ranked as "Exceptional" in service. In connection with that merit ranking, Department Chair Ronald Fell also stated: "Dr. Frost came into the Biology department and hit the ground running. He quickly set up his laboratory, established a solid graduate program that continues to grow, has applied for and received federal funding, and is actively publishing his research findings. I wish every new faculty member would use him as a model for 'how to start a new position.'" A copy of the Merit Recommendation is attached as **Exhibit 4.**

23. During the pre-tenure process and review, Dr. Frost received the unanimous approval of his peers and Dean Kempf-Leonard. He was poised for and had an interest in an early tenure appointment.

24. Over the course of his three years at U of L, Dr. Frost's students have twice ranked him as their favorite professor and his course evaluations from students are routinely excellent. No complaints had been filed against Dr. Frost prior to the events giving rise to this action. In fact, an anonymous exit survey conducted after a 2018 field course study in Peru resulted in all 12 participants' "recognize[ing] how concerned Drs. Frost and Yanoviak were for student health and safety." A copy of the Summary of Rain Forest Exit Survey is attached as **Exhibit 5.** One student commented that Drs. Frost and Yanoviak "were keen to know what was going on with each student and could be heard in passing updating each other on the well being and whereabouts of each student. I felt very safe . . . ." *Id.*

25. Faculty members in the Department of Biology at the University routinely host off-campus events to which students, both graduate and undergraduate, are invited. Those events advertise the availability of alcohol and sometimes consist of BYOB invitations. Invitations to two such events are attached as **Exhibit 6**. They are meant to foster collegiality. Some are sponsored by the University itself and include academically esteemed guest speakers. In a similar manner, on July 7, 2018, Dr. Frost hosted a potluck at his home. Those students who worked in his lab were invited to attend. A copy of the invitation is attached as **Exhibit 7.**

26. Five months later, on November 5, 2018, Jane Doe who had attended the potluck filed a false sexual harassment claim against Dr. Frost.

27.     On November 6, 2018, Schroeder, by e-mail, informed Dr. Frost of Ms. Doe's complaint, but did not provide him with notice of the substance of Ms. Doe's allegations. A copy of Schroeder's email is attached as **Exhibit 8.**

28.     On November 6, 2018, Dr. Frost asked to be "informed of the specifics of the complaint." A copy of Dr. Frost's email is attached as **Exhibit 9.**

29.     Despite having already interviewed Ms. Doe and thus despite knowing the substance of the specific allegations, Schroeder refused to inform Dr. Frost of those allegations. Instead, she said only this:

- You hosted a potluck at your house in the summer in which students were invited
- Alcohol was served; and
- Inappropriate touching occurred.  *See* **Exhibit 9**.

30.     On November 14, 15 and 27, Ernst and Schroeder interviewed two female students who had attended the July 7th potluck and two additional female students – neither of whom attended the potluck. None of these students witnessed the conduct alleged by Ms. Doe. One of these interviewees described conduct that Ms. Doe herself never alleged.  No male students were ever interviewed.

31.     At no time was Dr. Frost permitted to talk to or cross-examine Ms. Doe or anyone else whom Ernst and Schroeder elected to interview.  The identities of those interviewees were never disclosed to Dr. Frost in advance of Ernst and Schroeder's report.

32.     On December 5, 2018, Ernst and Schroeder interviewed Dr. Frost. During that interview, he again asked to be advised of the specific sexual misconduct which had been alleged. Ernst and Carter refused. Instead, Ernst told Dr. Frost he would have to figure that out based on the questions that they asked them. Dr. Frost denied the allegation that he had sexually harassed his accuser, Ms. Doe.

33. At no time during the course of the investigation did Ernst or Schroeder provide Dr. Frost with notice of the substance of Ms. Doe's allegations. At no time did Ernst or Schroder provide Dr. Frost with notice of the substance of any statement they procured from any other person whom they elected to interview.

34. To date, Dr. Frost has no idea which interviewees made the statements attributed to them in the Ernst and Schroeder report. While Ernst and Schroeder inadvertently disclosed the identities of the interviewees in their report, the report does not identify who said what.

35. The only conduct that Ernst and Schroeder "confirmed" as having taken place was this: "Dr. Frost placed his hands on Ms. [Doe]'s upper back and her hair." Although Ms. Doe herself had stated that this touching occurred while she was vomiting into a toilet, Ernst and Schroeder omitted that fact from their report. Despite having failed to confirm that any conduct of a sexual nature occurred, Ernst and Schroeder concluded that Dr. Frost violated the University's sexual harassment policy.

36. If conduct is not sexual, it is not sexual misconduct. The University's definition of sexual harassment makes this clear. The University defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." Personnel Policy 1.02 (A copy of this policy is attached as **Exhibit 10**).

37. On November 23, 2018, just about two weeks after Ms. Doe's interview with Ernst and Schroeder, she tried to follow Dr. Frost through ResearchGate, a social media website. Dr. Frost provided Ernst and Schroeder with evidence of this fact. There is no mention of this objective evidence in the Ernst and Schroeder report. Because Dr. Frost was wholly unaware of Ms. Doe's specific allegations, her effort to follow him on social media was the only piece of

information he could provide to rebut the suggestion that he had acted in a manner that alienated Ms. Doe.

38. The January 14, 2019 report by Ernst and Schroeder did not identify any University policy other than the sexual harassment policy that Dr. Frost's conduct supposedly violated. The University did not put Dr. Frost put on notice of any other violation of policy.

39. On January 15, 2019, Dr. Frost notified Schroeder and Kempf-Leonard that he would be seeking reconsideration of the report and its findings. Dr. Frost asked if there was a deadline with respect to submitting his request. Schroeder (then Carter) advised that there was no deadline for his submission. A copy of that e-mail is attached as **Exhibit 11.**

40. Before Dr. Frost could submit his request for reconsideration, ten business days later, on January 28, 2019, Dean Kempf-Leonard immediately relieved Dr. Frost of his "duties and responsibilities," declared him "*persona non gratis*," banned him from campus and forbade him from communicating with his students. Kempf-Leonard also advised that "the University will notify the National Science Foundation (NSF) of the final determination of the Human Resources investigation conducted in the fall." She recommended that Dr. Frost be formally terminated from his employment with the University.

41. According to his contract, Dr. Frost can be terminated only for cause and only in accordance with the Redbook. He cannot be fired unless "the cause substantially impairs effectiveness as a faculty member." *The Redbook*, Sec. 4.5.3 (A)(1). Cause is defined as "incompetence," "refusal to perform one's duty," or "immoral conduct." *Id.* Dean Kempf-Leonard's January 28, 2019 letter does not include any finding that Dr. Frost is an incompetent professor. It does not include any finding that Dr. Frost refused to teach a class, run his lab or

10

discharge any duty undertaken by him. The letter does not find that Dr. Frost engaged in sexual misconduct as defined by the University's sexual harassment policy.

42. There is no process to appeal the findings and conclusions reached by Schroeder and Ernst and contained in their January 14, 2019 report. The governing sexual harassment policy states that the findings made by the Employee Relations Department "are not subject to the appeal process." In turn, there is no means by which to rectify any notice to the NSF of the Ernst/Schroeder report that University elects to make.

43. While Dr. Frost may attempt to persuade an internal "grievance committee" that Dean Kempf-Leonard's conduct was too punitive or improper, there is no avenue for Dr. Frost to remedy the constitutional violations or to remove the stigma of being labeled a sex offender. Nor is there any guarantee that this limited appeal would provide for cross-examination.

## COUNT I
## DEPRIVATION OF PROPERTY INTERESTS

44. Dr. Frost incorporates by reference all preceding paragraphs as if fully restated here.

45. Under the Fourteenth Amendment to the United States Constitution, as a tenure-track professor Dr. Frost had a clearly established property right. He also had a clearly established property right in his role as an advisor to students which is necessary to his scholarship and to his standing in the academic community. Mentoring students, collaborating with his co-faculty, and running his lab are also necessary to Dr. Frost's ability to continue his research, receive grants, engage in scholarship and maintain standing in academia.

46. Defendants' conduct stigmatized Dr. Frost and his immediate removal from his job deprived him of his protectable property.

47. The University of Louisville as well as Ernst, Schroeder and Kempf-Leonard who acted in their individual and official capacities deprived Dr. Frost of his clearly established property rights without due process of law by failing to provide him with adequate notice of the allegations against him and by preventing him from cross-examining his accuser and the other students who were selected by Ernst and Schroeder for interviews.

48. Defendants also deprived Dr. Frost of his protectable property interests by making the determination that he violated the University sexual harassment without factual basis, by deeming him *persona non gratis*, by banishing him from campus, by barring any further interaction with his students, and by jeopardizing his NSF grant without factual basis.

49. Defendants deprived Dr. Frost of his constitutional property rights without due process of law as Dr. Frost did not have adequate notice of the charges against him, adequate notice of the evidence used against him, the ability to cross-examine his accuser and other witnesses, or the ability to challenge any other evidence against him.

50. Ernst, Schroeder and Kempf-Leonard, acting in their individual and official capacities, executed official University policy that deprived Dr. Frost of his constitutionally protected property and liberty interests by making sexual misconduct determinations without due process of law and without factual basis, by disregarding the University's own process, and by falsely finding that Dr. Frost had violated the University's sexual harassment policy and by terminating Dr. Frost's employment through banishment from his lab and barring communication with his students.

51. At all times relevant hereto, Defendants were acting under color of state law and their acts and omissions were conducted within the scope of their official duties or employment. Thus, Defendants are liable to Dr. Frost pursuant to 42 U.S.C. § 1983 for their deprivation of his

property interests without due process of law. Dr. Frost is entitled to injunctive relief as a result of the violation of his constitutional right to due process.

52. Defendants' unlawful conduct has proximately caused Dr. Frost to incur damages, including but not limited to loss of liberty, embarrassment, humiliation, and emotional distress.

53. Defendants acted willfully, knowingly, and purposefully or with deliberate indifference to or reckless disregard of Dr. Frost's his constitutional rights. As a result, Dr. Frost is entitled to punitive damages.

## COUNT II
## DEPRIVATION OF LIBERTY INTEREST

54. Dr. Frost incorporates by reference all preceding paragraphs as if fully restated here.

55. Dr. Frost had a liberty interest in his good name, honor and reputation and pursuing his chosen occupation in which he developed an excellent reputation in the academic community.

56. Dr. Frost's liberty interest was impugned by Defendants who have stigmatized Dr. Frost by means of voluntary, public dissemination of false information about Dr. Frost. Biology Department Chair Perri Eason has put all department faculty on notice of the Dean's decision. Dr. Eason has advised graduate students to reconfigure their graduate committees (a panel of professors who guide a student's graduate degree process) to exclude Dr. Frost, and, at least one graduate student, was told to find a new major advisor. No less than one graduate student, who had selected Dr. Frost as her major professor, has already advised a non-University-of-Louisville professor who sits on her committee that she must find a replacement for Dr. Frost as instructed.

57. Defendants have altered and deprived Dr. Frost of his status as a tenure-track Assistant Professor by banishing him from his lab, by barring him from communicating with his students, and by preventing him from the use and management of the NSF grant funds in furtherance of his career.

58. The statements made against Dr. Frost have imposed a stigma on Dr. Frost, impugning his standing and associations within the academic community.

59. As a direct and proximate result of the actions of the Defendants, Dr. Frost has suffered an unconstitutional deprivation of his liberty without being accorded due process of law under the Fourteenth Amendment to the Constitution and he is entitled to injunctive relief as a result of this violation of his constitutional rights.

60. As a direct and proximate cause of Defendants' unlawful conduct, Dr. Frost has suffered substantial damages, including but not limited to lost wages, loss of liberty, embarrassment, humiliation, and emotional distress.

61. Defendants acted willfully, knowingly, and purposefully or with deliberate indifference to or reckless disregard of Dr. Frost's his constitutional rights. As a result, Dr. Frost is entitled to punitive damages.

## COUNT III
## REQUEST FOR IMMEDIATE INJUNCTIVE RELIEF

62. Dr. Frost incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

63. Dr. Frost requests this Court immediately issue an injunction prohibiting the University or any of its employees or other agents from informing the National Science Foundation of any alleged policy violations, for the reasons set forth in his Motion for Immediate Injunctive Relief, filed this same day.

64. Dr. Frost requests this Court immediately issue an injunction enjoining U of L from enforcing Dean Kempf-Leonard's sanctions and that requires U of L to fully reinstate Dr. Frost to his tenure-track position as an Assistant Professor in the university's Biology Department pending the outcome of this litigation, for the reasons set forth in his Motion for Immediate Injunctive Relief, filed this same day.

65. Dr. Frost requests this Court immediately issue an injunction requiring U of L to provide Dr. Frost with full credit for any class or research work missed as a result of Defendants' wrongful conduct, a name-clearing, and an expunging of any disciplinary and employment record in regard to the present matter pending the outcome of this litigation, for the reasons set forth in his Motion for Immediate Injunctive Relief, filed this same day.

## COUNT IV
## DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

66. Dr. Frost incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

67. Dr. Frost requests this Court issue a declaratory judgment deeming unconstitutional any and all policies, procedures, practices, and/or customs, whether written or unwritten, under which Dr. Frost was deprived his constitutional rights as set forth above, and further requests that the court permanently enjoin Defendants from following or enforcing such policies, procedures, practices and/or customs.

68. Dr. Frost further requests that he be granted permanent injunctive relief in the following forms:

    a.    That the University reinstate Dr. Frost as an Assistant Professor;

    b.    That the University grant him full credit for any class or research work missed as a result of Defendants' wrongful conduct;

    c.    That the University be required to publicly clear Dr. Frost's name and to expunge any disciplinary and employment record created with respect to the events giving rise to this action; and

    d.    That the University and all its employees and other agents be enjoined from disclosing any information with regard to Dr. Frost's discipline or alleged policy violations in any context, including but not limited to any report to the National Science Foundation or letters of recommendation or reference.

## COUNT V
## DAMAGES

69.    Dr. Frost incorporates by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

70.    As a result of Defendants' unlawful conduct, Dr. Frost is entitled to compensatory damages in an amount exceeding the jurisdictional minimums of this Court.

71.    Dr. Frost is entitled to punitive damages for the willful, wanton, oppressive, malicious, and/or grossly negligent conduct of Defendants, as if set forth above.

72.    Pursuant to 42 U.S.C. § 1988, Dr. Frost is further entitled to his costs and attorneys' fees in bringing and maintaining this action, plus interest.

WHEREFORE, Plaintiff, Dr. Christopher Frost, respectfully requests the following:

1. Immediate injunctive relief, as requested above;
2. A permanent injunction and declaratory judgment, as requested above;
3. An award of compensatory and punitive damages as set forth in the Complaint above against all Defendants, jointly and severally;
4. Trial by jury on all issues so triable;
5. His costs and attorneys' fees, plus pre- and post-judgment interest;

6. Any and all other relief to which he may be entitled.

        Respectfully submitted,

        */s/ R. Gregg Hovious*
        R. Gregg Hovious
        Loren T. Prizant
        Matthew P. Dearmond
        MIDDLETON REUTLINGER
        401 South 4th Street, Suite 2600
        Louisville, KY 40202
        (502) 584-1135
        *ghovious@middletonlaw.com*
        *lprizant@middletonlaw.com*
        *mdearmond@middletonlaw.com*

        - and –

        Mary E. Eade
        Jason M. Nemes
        Nemes Eade PLLC
        914 Lily Creek Rd, Suite 202
        Louisville, KY 40243
        502.792.0350
        *meade@nemes-eade.com*
        *jnemes@nemes-eade.com*

        *Counsel for Plaintiff, Dr. Christopher Frost*

## VERIFICATION

I, CHRISTOPHER FROST, acknowledge that the factual statements contained in the preceding Complaint are true and complete to the best of my knowledge, information and belief.

By: _____
Christopher Frost

COMMONWEALTH OF KENTUCKY   )
                                                        ) SS:
COUNTY OF JEFFERSON              )

Subscribed and sworn to before me this March 27, 2019, by CHRISTOPHER FROST.

_____
NOTARY PUBLIC

My Commission Expires: _July 31, 2021_