UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DR. CHRISTOPHER FROST                                                    PLAINTIFF

v.                                                      CIVIL ACTION NO. 3:19-CV-227-CRS

UNIVERSITY OF LOUISVILLE, ET AL.                                   DEFENDANTS

## MEMORANDUM OPINION

### I.  INTRODUCTION

This matter is before the Court upon Plaintiff Dr. Christopher Frost's Amended Motion for Preliminary Injunction and Permanent Injunction.  DN 21.  Defendants have responded (DN 22), and Plaintiff has replied (DN 24).  This matter is now ripe for adjudication.  For the reasons that follow, Frost's motion for preliminary injunction and permanent injunction will be **GRANTED IN PART** and **DENIED IN PART**.

### II.  BACKGROUND

This litigation arises out of the termination of Plaintiff Dr. Christopher Frost from his tenure-track appointment as an Assistant Professor of Biology at the University of Louisville. Frost filed this action on March 27, 2019, pursuant to 42 U.S.C. § 1983.  Frost seeks a preliminary injunction restoring him to his tenure-track appointment asserting that Defendants deprived him of protectable property and liberty interests without due process of law under 42 U.S.C. § 1983.

The parties jointly filed a stipulation of facts (DN 19) and the relevant facts are undisputed. The Court adopts the stipulation and reproduces it below as presented by the parties:

1.      On March 13, 2015, the University of Louisville ("U of L") offered Dr. Christopher Frost a probationary, tenure-track appointment as an Assistant Professor of Biology in the College of Arts and Sciences. Dr. Frost accepted the offer. A true and accurate copy of

the March 13, 2015 offer letter is attached as Exhibit 4 to the Amended Complaint.

2.      The March 13, 2015 offer letter stated that, "the conditions governing employment at the University of Louisville are contained in the University's governance document, the *Redbook*."

3.      The March 13, 2015 offer letter further provided that:

> Your review for tenure will be no later than academic year 2020-2021, with tenure to be effective July 1, 2022. If your review during academic year 2020-2021 results in a decision not to grant tenure, your appointment for 2021-2022 would be terminal. Termination of your appointment prior to that time would be subject to the provisions of the *Redbook*. The policies and procedures for all personnel reviews are specified in the *Redbook* and the College of Arts and Sciences *Personnel Policy and Procedures*.

4.      Over the course of his three-year tenure at the University, Dr. Frost has supervised the work of graduate and undergraduate students. Dr. Frost supervised the laboratory research, article-writing and other post-graduate work of three graduate students, one post-doctoral scientist and eight undergraduate students, all of whom work in the laboratory created by Dr. Frost.

5.      In 2017, the National Science Foundation awarded Dr. Frost in excess of $700,000 for use in his on-going research (the "Grant").

6.      On July 7, 2018, Dr. Frost hosted a potluck at his home. He invited those students who worked in his lab. He also included his accuser, Jane Doe, in the invitation. Doe is a student in the Biology Department at the University of Louisville. Defendants Ernst and Schroeder concluded that Doe was under the age of 21 at the time of the July 7, 2018 potluck. Defendants Ernst and Schroeder made no finding respecting whether Dr. Frost knew Doe was under 21 at the time of the potluck.

7.      Dr. Frost bought a six-pack of beer for himself for the July 7, 2018 event. The

invitees were permitted to bring alcohol to the event; that is, it was BYOB. Doe alleged that Dr. Frost offered her a beer but that she turned it down because she already had one. Dr. Frost disputes the allegation that he offered Doe a beer. He agrees that Doe was drinking beer at the potluck. Defendants Ernst and Schroeder "were unable to confirm Dr. Frost offered [a beer] to Ms. [Doe]." Case Summary Report at 5.

8.      Doe indicated that she wanted to stay after the other potluck attendees left. Dr. Frost and Doe continued talking in the living room. While the parties were not able to reach a stipulation as to the events leading up to Doe's consumption of bourbon, they agree that Doe drank some bourbon at Dr. Frost's home. The parties also agree that Defendants Ernst and Schroeder "were unable to confirm that Dr. Frost poured bourbon in a glass for Ms. [Doe]." Case Summary Report at 5.

9.      Afterward, Doe became ill, and while she was vomiting into a toilet, Dr. Frost held her hair back and rubbed the top of her back. Defendants Ernst and Schroeder "confirmed Dr. Frost placed his hands on Ms. [Doe]'s upper back and her hair." Case Summary Report at 6.

10.     On November 5, 2018, Doe brought a complaint alleging harassment based on gender/sex against Dr. Frost. Ms. Doe lodged her complaint with the University's Employee Relations Department. Defendants Laura Schroeder and Donna Ernst interviewed Ms. Doe on November 5, 2018 as a part of their fact finding pursuant to the U of L's sexual harassment policy (Personnel Policy 1.02).

11.     On November 6, 2018, Dr. Frost received this e-mail message from Defendant Laura Schroeder (f/k/a Laura Carter):

> On November 5, 2018, Human Resources received a complaint from [Jane Doe] alleging harassment based on gender/sex. The complaint names you as a respondent.

3

The University takes complaints of this nature very seriously. Our office has initiated an investigation in accordance with University policy and procedures. An investigation is generally completed within sixty (60) business days of receipt of the complaint; you will be notified if additional time is necessary. Upon the conclusion of the investigation you will receive a copy of our findings.

The same laws that prohibit discrimination and harassment also prohibit retaliation against individuals who oppose unlawful discrimination or participate in an employment discrimination proceeding. The University will investigate any reported retaliation any person who is party to a complaint process under these guidelines that are consistent with University policies and procedures and the law.

Our office will contact you to schedule an appointment and further discuss the allegations in the complaint. If you have any questions regarding this matter, please do not hesitate to contact me.

Thank you,

Laura Carter
EEO – Employee Relations Specialist
Human Resources . . . .

12.   On November 6, 2018, Dr. Frost sent this email to Defendant Schroeder (f/k/a Carter): "Dear Laura Carter, I would like to be informed of the specifics of the complaint.  Thank you, Dr. Frost."

13.   On November 7, 2018, Ms. Carter, now Schroeder, sent this email to Dr. Frost:

Good Afternoon Dr. Frost,

The harassment complaint based on gender/sex contained the following allegations:

- You hosted a potluck at your house in the summer in which students were invited;
- Alcohol was served; and
- Inappropriate touching occurred.

We will further discuss these allegations when we meet and you will have an opportunity to respond and ask questions. This is a fact finding meeting, not a formal hearing.

4

14.     The Sexual Harassment Policy (Personnel Policy 1.02) sets forth the process for investigating and resolving complaints made pursuant to the Sexual Harassment Policy.

15.     The *Redbook* applies to all faculty and staff members employed at the University.

16.     Defendants Ernst and Schroeder interviewed six witnesses as a part of their fact finding investigation. Two had attended the potluck. Four had not attended the potluck. The identities of those students whom Ernst and Schroeder selected for interviews were not disclosed to Dr. Frost in advance of or during his interview. None of the specific statements made by his accuser or any other interviewee was disclosed to Dr. Frost in advance of or during his interview.

17.     Dr. Frost was interviewed by the University's Employee Relations and Compliance Office on December 5, 2018. Dr. Frost provided Ernst and Schroeder with a copy of Doe's post-complaint effort to follow him through ResearchGate, a social media website.

18.     Dr. Frost was not given the opportunity to question or cross-examine Jane Doe or anyone else whom Defendant Ernst and Defendant Schroeder interviewed.

19.     On January 14, 2019, Defendants Ernst and Schroeder disclosed their findings, whom they selected to interview, statements which they obtained and selected for inclusion in the report, and the conclusion they drew that Dr. Frost had violated the U of L's sexual harassment policy. Those findings and conclusions are contained in a "Case Summary Report." Defendants Ernst and Schroeder emailed the report to Dr. Frost, Dean Kimberly Kempf-Leonard, Provost Beth Boehm, and Chief Human Resources Officer John Elliott.  They also e-mailed their report to Dr. Frost's accuser, Jane Doe. A true and accurate copy, redacted only to prevent disclosure of student names, of the Case Summary Report is attached as Exhibit A.

20.     The pertinent U of L sexual harassment policy is Personal Policy 1.02 ("Per

102"). It sets out the process for an internal investigation of sexual harassment claims at the University. Dr. Frost's accuser filed a formal complaint. Defendants Ernst and Schroeder followed the steps in the process for formal complaint resolutions as set out in Per. 102, Section VII, with respect to Jane Doe's formal complaint. A true and accurate copy of Section VIII of Per. 102 is attached to the Amended Complaint as Exhibit 1.

21.    Section VIII (1) provides:

> Upon completion of the investigation, a Case Summary Report will be completed documenting the scope of the investigation and resulting in a factual determination as to whether the evidence supports the allegation(s) of the complaint. These confidential findings will be submitted to the appropriate administrator(s) to render any disciplinary action (as appropriate) that is deemed necessary. In cases that involve faculty members a copy of these findings will be submitted to the University Provost. The Complainant as well as the Respondent will receive a copy of the findings.

22.    Section VII (2), Reconsideration of the Determination, provides:

> If the investigation results in a factual determination that the evidence supports the allegation(s) of the complaint (a "cause" finding) then, upon request, the Employee Relations and Compliance Office may, for reasonable cause, reconsider the determination.

> The decision rendered upon completion of the investigative process in the Case Summary Report is not subject to the appeal process. For reconsideration, a written request should be submitted to the Employee Relations and Compliance Office accompanied by affidavits or other written documentation that would substantially alter the findings of the investigation.

23.    On January 15, 2019, Dr. Frost notified Defendant Schroeder and Defendant Kempf-Leonard that he intended to seek reconsideration  Dr. Frost also asked for clarifications of the process going forward, including whether a deadline for reconsideration existed by sending the following email:

Ms. Schroeder:

This e-mail is to let you know that I intend to seek reconsideration of the findings and conclusions reached that are contained in the summary. I am unclear as to the process for doing so. Do I submit that request to you or to someone else and if to someone else, to whom? Is there a deadline with which I must comply? As well, can you explain if any process outlined in the Redbook has been triggered by the report? I don't understand because it seems I am not allowed "to appeal" but it also says that the proceedings outlined in the Redbook apply. A general explanation of the process going forward would also be appreciated.

Thank you for your attention to these questions,
Dr. Frost

24.     Defendant Schroeder responded:

Good Afternoon Dr. Frost,

PER 1.02 – Sexual Harassment, *If the investigation results in a factual determination that the evidence supports the allegation(s) of the complaint (a "cause" finding) then, upon request, the Employee Relations and Compliance Office may, for reasonable cause, reconsider the determination. The decision rendered upon completion of the investigative process in the Case Summary Report is not subject to the appeal process. For reconsideration, a written request should be submitted to the Employee Relations and Compliance Office accompanied by affidavits or other written documentation that would substantially alter the findings of the investigation.*

You may submit your documentation to emrelate@louisville.edu. Per the policy, there is no stated deadline for submitting your documentation.

Please contact Tracy Eells in Faculty Affairs regarding your questions about the Redbook.

Please let me know if you have any additional questions.

Thank you,

Laura Schroeder

(emphasis in original).

25.     On January 18, 2019, Dr. Frost sought clarification from Dr. Eells:

Dr. Eells:

I have been advised by Laura Schroeder to contact you with respect to an internal investigation pertaining to an allegations and a conclusion that I have violated the University's sexual harassment policy. I am seeking a reconsideration of the adverse finding/report for several reasons, including, among others, that the process of the investigation was entirely and fundamentally unfair. Now, HR has refused to explain to me how the process works going forward. When I asked for an explanation, I essentially received a cut-and-paste of the language of the policy, which is the problem as the policy is not clear. I have attached the email exchange I had on this topic. I do now understand from the attached email that I am not operating under any deadline with respect to reconsideration of the report generated by HR. However, Ms. Schroeder either could not or would not explain to me if, how or when the provisions of the Redbook come into play with respect to the report generated by HR. Instead, she said I needed to ask you.

So I ask that you please tell me if there are any steps required of me at this juncture with respect to the filing of any sort of grievance or notice pursuant to the Redbook. It is not clear to me upon reading the Redbook what if anything I am required to do while pursuing reconsideration. I certainly have every intention of complying with University procedures, but need help understanding when I may need to proceed under the Redbook. The HR policy appears to be self-contradictory. On the one hand, it says I can't appeal and on the other it says that the Redbook applies. If I need to file a grievance or some sort of notice at this juncture, please advise me of that need and any deadline and I will promptly comply. While I anticipate that there is no need for a grievance or notice at this point because there has been no final decision and I am seeking reconsideration, I am sure you can appreciate my concern for ensuring that I am correct about that and that going forward I do what is required of me by U of L's policies and procedures pursuant to the Redbook. I will look forward to hearing back from you on these questions and I thank you for your attention to my concerns.

Sincerely,
Dr. Frost

26.   On January 21, 2019, Dr. Eells wrote:

Dr. Frost,

I am not aware of any process in the Redbook that has been triggered by this report. Nor am I aware of any steps required of you regarding a grievance or notice pursuant to the Redbook. You note that HR policy says that the Redbook applies, but I am not sure what you are referring to.

Sincerely,

8

Tracy D. Eells, MBA, PhD
Professor and Vice Provost for Faculty Affairs

27.     On January 28, 2019, Defendant Kempf-Leonard sent a letter to Dr. Frost. A true
and accurate copy of the January 28, 2019 letter is attached as Exhibit 2 to the Amended
Complaint and its contents are incorporated by reference as if fully restated herein.

28.     From July 7, 2018 through January 28, 2019, Dr. Frost managed his lab and
taught a full course in the Fall 2018. He was scheduled to and began to teach a course in the
Spring 2019. During that time, Dr. Frost received outstanding evaluations and a Faculty Favorite
nomination from students, and "Highly Proficient" and "Exceptional" merit evaluations from
faculty and the chair of his department. During the pre-tenure process and review, Dr. Frost
received the unanimous approval of his peers and defendant Dean Kempf-Leonard. No
complaints had been filed against Dr. Frost prior to the events giving rise to the above-captioned
lawsuit.

29.     Section 4.5.3 of the *Redbook*, "Termination of Academic Employment Before
the End of a Specified Term or for Persons with Tenure," states that "Termination of an
appointment with tenure, or of a special or probationary appointment before the end of the
specified term,  may be effected by the institution for any of the following causes only if the
cause substantially impairs the effectiveness as a faculty member: (i) Incompetence; (ii) Neglect
of or refusal to perform one's duty; (iii) Immoral conduct."

30.     As of the date of this Agreed Stipulation of Facts, Dr. Frost has not notified the
University Faculty Grievance Committee of his intention to appeal Defendant Kempf-Leonard's
recommendation.

### III.  LEGAL STANDARD

"The granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court."  *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977) (citations omitted).  The Supreme Court and the Sixth Circuit have noted that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).  When considering whether to grant or deny a preliminary injunction, a district court must consider and balance four factors:

> (1) the plaintiff['s] likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest

*Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006) (*quoting Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)).  The four factors should be "balanced[,]" are "not prerequisites that must be satisfied[,]" and "are not meant to be rigid and unbending requirements." *In re Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citations omitted).

### IV.  DISCUSSION

The Court has closely scrutinized the joint stipulation of facts and the parties' respective briefs, and has concluded that a hearing is not necessary to properly adjudicate the motion for preliminary injunction.  Accordingly, the Court will now proceed to address whether Frost has carried his burden of demonstrating that injunctive relief is warranted.

#### A.  Likelihood of Success on the Merits.

Frost claims that his constitutional right to due process was violated because the University's officials neither gave him adequate notice of the charges leading to his termination,

10

nor did the University afford an opportunity for a hearing with cross-examination prior to his termination.  To succeed on his due process claim, Frost must show that he has a property or liberty interest in his job as a tenure-track professor and that Defendants failed to provide sufficient process in depriving him of that interest.    *Lane v. City of Pickerington*, 588 F. App'x 456, 464 (6th Cir. 2014).  Upon review of the legal precedent governing his claims, the Court finds that Frost is likely to succeed on the merits of his due process claim based on his protected property interest in his tenure-track appointment.

### i.   Property Interest Claim

#### a.   Whether Frost had a protected property interest in his tenure-track appointment

Frost first claims that he was deprived of a protected property interest without due process when his tenure-track appointment was terminated.  To have a protected property interest in his tenure-track position, Frost "clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004) (citations omitted).  Moreover, an agreement that an employee will be discharged only for cause can constitute a property interest entitled to due process protection.  *Id.* at 566.

Frost's offer letter states, "the conditions governing employment at the University of Louisville are contained in the University's governance document, the *Redbook*."  Joint Stipulation of Facts, DN 19, at ¶ 2.  The offer letter further provides:

> Your review for tenure will be no later than academic year 2020-2021, with tenure to be effective July 1, 2022. If your review during academic year 2020-2021 results in a decision not to grant tenure, your appointment for 2021-2022 would be terminal. Termination of your appointment prior to that time would be subject to

the provisions of the *Redbook*. The policies and procedures for all personnel reviews are specified in the *Redbook* and the College of Arts and Sciences Personnel Policy and Procedures.

*Id.* at ¶ 3.

It is important to distinguish the two relevant employment actions contemplated by the *Redbook*.   Section 4.5.2, "Probationary Academic Appointments," outlines the procedures for when the University decides not to *renew* an appointment.  DN 22-2, at 19–20.  It requires "twelve months [notice] before the expiration of the appointment" that an appointment is not to be renewed for an employee with more than two years of service.  *Id.* at 20.  This provision does not require cause for the non-renewal of a probationary appointment.  The *Redbook*, however, contains a separate provision governing the procedures for terminating employment *before the end of the appointment's term*.   Section 4.5.3, "Termination of Academic Employment Before the End of a Specified Term…," does require cause in order for the University to terminate an appointment before the end of the term:

> Termination of . . . a special or probationary appointment before the end of the specified term, may be effected by the institution for any of the following causes only if the cause substantially impairs effectiveness as a faculty member:
> A. Incompetence,
> B. Neglect of or refusal to perform one's duty,
> C. Immoral conduct.

*Id.* at 20.  Thus, the University could decide not to renew Frost's tenure-track appointment without cause under 4.5.2 provided that they give him the required twelve months' notice.  But the University could only terminate Frost before the end of his term for cause pursuant to Section 4.5.3.

Defendants argue that Frost has no protected property interest because his termination was not effective until the end of his term.  Defendants' argument is an interesting one.  On one hand, Defendants acknowledge that "college professors and staff members ***dismissed during the terms***

12

*of their contracts* have interests in continued employment that are safeguarded by due process." DN 22, at 11 (quoting *Silitonga v. Ky. State Univ.*, No. 3:16-cv-00029-GFVT, 2018 WL 3236055, at *5 (E.D. Ky. June 30, 2018)) (emphasis in Defendants' brief). Then, much like trying to fit a square peg into a round hole, Defendants argue that Frost "was ***not*** dismissed ***during the term of his probationary appointment***." DN 22, at 11 (emphasis in Defendants' brief). To put it another way, Defendants claim that they simply chose not to renew Frost's appointment as afforded under Section 4.5.2 of the *Redbook*. In support of their argument, Defendants point to the January 28, 2019 letter which recommends termination effective June 30, 2019 (the end date for Frost's 2018-2019 term). However, the letter also places Frost "on administrative leave with pay until May 31, 2019," immediately relieves Frost "of [his] duties and responsibilities," and bestows upon him the status of "*persona non gratis* at the University." Termination Letter, DN 21-18, at 2. Most notably, the letter explicitly states the recommendation to terminate is made "pursuant to Section 4.5.3 of the [] *Redbook* based upon your 'neglect of or refusal to perform your duty and/or immoral conduct' which substantially impairs your effectiveness as a faculty member." *Id.* We conclude that Defendants unmistakably terminated Frost before the end of his 2018-2019 appointment term pursuant to Section 4.5.3 of the *Redbook*.

Defendants also suggest that Frost does not have a protectable property interest in continued employment at the University, regardless of what method the University used, because the *Redbook* provides a mechanism by which the University could decline to renew Frost's contract without cause. Defendants rely on *Melendez v. Sinclair Community College*, No. 3:05-cv-338, 2007 WL 81846, at *1 (S.D. Ohio Jan. 8, 2007), and characterize it as "holding that a tenure-track professor did not have a protected property interest in a successive employment

13

contract where a faculty handbook provided for non-renewal of the contract without cause." DN 22, at 10–11. To the contrary, *Melendez* is actually harmful to Defendants' argument.

In *Melendez*, the plaintiff was a tenure-track associate professor and his position was subject to renewal on an annual basis. 2007 WL 81846, at *2. The plaintiff was employed continuously for a total of seven academic years. *Id.* at *3. The faculty handbook explicitly provided that contracts would not be renewed if the faculty member did not make tenure by the end of their seventh contract year. *Id.* The plaintiff claimed that he had a protectable property interest in one more year of employment (which would have been his eighth contractual year). *Id.* at *6. The court disagreed, holding that the handbook made clear that his contract would not be renewed if he failed to secure tenure. *Id. At the same time, the court found that the plaintiff had a property interest in employment for the year prior* (his seventh contractual year). *Id.* at *7 ("Although Plaintiff had a property interest in his 2003-2004 contract, he had no such interest in a 2004-2005 contract").

Much like the plaintiff in *Melendez*, Frost was a tenure-track associate professor whose employment was subject to renewal on an annual basis. But unlike the plaintiff in *Melendez*, Frost had not yet reached the term that was subject to automatic non-renewal. Frost was employed continuously for the academic years 2015-2016, 2016-2017, and 2017-2018. His employment was renewed for the 2018-2019 academic year, but his employment was cut short when the University terminated him pursuant to Section 4.5.3 of the *Redbook*. Once the University decided to renew Frost's tenure-track term for the 2018-2019 academic year, Frost's property interest in that continued employment vested and he could not be terminated prior to the completion of that term but for cause pursuant to Section 4.5.3 of the *Redbook*. *See Bd. of Regents v. Roth*, 408 U.S. at 576–77 ("[C]ollege professors and staff members dismissed during the terms of their

14

contracts…have interests in continued employment that are safeguarded by due process"); *see also Silitonga*, 2018 WL 3236055, at *5–*6 (allowing tenure-track professor's § 1983 due process claims to proceed past summary judgment where university terminated her while she was under contract).

Even if the University chose not to renew Frost's appointment pursuant to Section 4.5.2, the Court finds that Frost has a property interest in his employment for the 2019-2020 academic year because the University did not provide him with the requisite twelve months' notice as required by the *Redbook*.  Section 4.5.2 of the *Redbook* plainly indicates that "[w]ritten notice that a probationary appointment is not to be renewed shall be given" … "at least twelve months before the expiration of the appointment."  DN 22-2, at 20.  Based on the *Redbook*, the University's governing document, a professor with a probationary appointment has an expectation that his appointment will be renewed unless the University informs him or her otherwise within the allotted time.  Accordingly, Frost's interest to the 2019-2020 term vested when the University did not notify him otherwise by June 30, 2018.  The Court finds that a "mutually explicit understanding that supports [Frost's] claim of entitlement" to his 2018-2019 and 2019-2020 terms existed between Frost and the University.  *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)) (cleaned up).  Thus, we must next determine whether Defendants provided sufficient process before depriving Frost of that protected property interest.

### b.  Whether the University satisfied the due process requirements of the Fourteenth Amendment

In procedural due process claims, it is not the deprivation of the protected interest itself that is unconstitutional; "what is unconstitutional is the deprivation of such an interest *without due process of law*."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original).  The amount

of process due will vary according to the situation. *Sharp v. Lindsey*, 285 F.3d 479, 488 (6th Cir. 2002). There are two basic due process requirements: (1) notice and (2) an opportunity to be heard. *Flaim v. Med. College of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005). The Supreme Court has described the "root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

In this case, Frost argues the University provided insufficient process in two ways. First, Frost asserts that because the allegations involved competing narratives, Frost was entitled to cross-examine his accuser and the University's other witnesses. Second, Frost alleges he was deprived of meaningful notice of the charges against him and the grounds for which he was terminated.

The Sixth Circuit has repeatedly recognized the importance of cross-examination in the context of sexual misconduct allegations. In *Doe v. Univ. of Cincinnati*, the Sixth Circuit held that, in a case that turns on credibility, cross-examination is "not only beneficial, but essential to due process." 872 F.3d 393, 402 (6th Cir. 2017) (quoting *Flaim*, 418 F.3d at 641) (internal quotation marks omitted). Just last year, the Sixth Circuit resolutely reiterated that holding: "if a public university has to choose between competing narratives to resolve a case, the university must give the accused [] or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018). *See also Smock v. Bd. of Regents of Univ. of Michigan*, 353 F. Supp. 3d 651, 657 (E.D. Mich. 2018) (applying *Baum*'s cross-examination requirement to a university professor's hearing for alleged misconduct); *Kerber v. Wayne Cty. Employees Ret. Sys.*, No. 18-12049, 2019 WL 1354049, at *7 (E.D. Mich. Mar. 26, 2019) (applying *Baum*'s cross-examination requirement to an employee's

16

pension termination hearing where the decision-maker must choose between competing narratives to resolve the case).

Defendants maintain that Frost was not entitled to cross-examination and attempt to distinguish *Baum* in two ways. First, Defendants claim the University took no formal action based on the Case Summary Report or the finding that Frost violated the Sexual Harassment Policy. The Court cannot agree. The termination letter explicitly states, as one of the grounds for dismissal, the following: "Engaging in unwelcome, inappropriate physical conduct toward a student, which resulted in the student's departure from your class and/or lab." Termination Letter, DN 21-18, at 2. Even if this Court were to entertain the fiction that the University took no direct action based on the Case Summary Report, then the University's notice of the charges against Frost would be deficient.

Next, Defendants assert that cross-examination was not necessary because there was no competing narrative and, in fact, Frost "*presented an account which was consistent with Doe's*." DN 22, at 18 (emphasis in original). Again, the Court cannot agree. The investigators concluded that while Doe was ill and vomiting into a toilet, Frost held her hair back and rubbed the top of her back. *See* Joint Stipulation of Facts, DN 19, at ¶ 9; Case Summary Report, DN 19-1, at 7. However, investigators were unable to confirm that Frost touched Doe's lower back, under her shirt, or tugged on her belt loops as alleged by Doe. Case Summary Report, DN 19-1, at 7. They were also unable to confirm that Frost attempted to sit in the same chair with Doe as alleged by one of the witnesses interviewed. *Id*.

This is the quintessential case of competing narratives that warrants cross-examination under *Baum*. Cross-examination "is the greatest legal engine ever invented for uncovering the truth." *Baum*, 903 F.3d at 581 (internal quotation marks and citation omitted). It allows "the

17

accused to identify inconsistencies in the other side's story" and "gives the fact-finder an opportunity to asses a witness's demeanor and determine who can be trusted." *Id*. "Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives." *Id*. at 582 (citing *Univ. of Cincinnati*, 872 F.3d at 402).

This circuit has recognized, time and time again, the lasting impact on a student's life of being labeled a sex offender by a university. *See Baum*, 903 F.3d at 582; *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018). And the same holds true for professors who have been branded with the stigma of touching a student inappropriately. A professor will surely face great challenges in obtaining employment following his or her termination that is grounded, at least on part, on the inappropriate touching of a student. Yet, the University decided Frost's fate without allowing him to question or probe Doe's or any of the other witnesses' stories.

While the Court recognizes the University's great interest in protecting its students and enforcing its Sexual Harassment Policy, the University cannot disregard the constitutional rights of its faculty members. If a professor with a protected interest is accused of misconduct, due process requires the university to hold some sort of hearing before imposing a sanction as serious as termination. And where the university's determination turns on the credibility of the accuser, the accused, or other witnesses, that hearing must also include an opportunity for cross-examination. *Baum*, 903 F.3d at 581.

The University also suggests that Frost could have used the University's grievance process as a satisfactory post-deprivation procedure. However, in the context of employment rights, due process requires the opportunity for a hearing *before* the employee is deprived of any significant property interest. *See Lane*, 588 F. App'x at 464.

18

Frost also claims that he was deprived of meaningful notice of the charges against him. Due process requires that, prior to the termination of a faculty member with a property interest in his employment, the university give oral or written notice of the charges against him, an explanation of the university's evidence, and an opportunity to present his or her side of the story to the employer. *See McDaniel v. Princeton City School Dist. Bd. of Educ.*, 45 F. App'x 354, 358 (6th Cir. 2002).

Defendants contend that they provided Frost such process with respect to both the allegations of sexual harassment and the termination of his appointment. As satisfactory notice, Defendants point to Schroeder's November 7, 2018 email that clarified that the complaint made against Frost was "based on gender/sex" and contained allegations that: 1) Frost hosted a potluck at his house in the summer in which students were invited; 2) alcohol was served; and 3) inappropriate touching occurred. Defendants also assert they provided him "ample opportunity to present his account," stressing that during the interview of Frost on December 5, 2018, they disclosed the complainant's name and asked specific questions about the potluck based on Frost's responses. Yet, at the same time, Defendants contend that the University did not terminate Frost based on the Case Summary Report or a violation of the Sexual Harassment Policy.

The stronger the private interest, the more likely formal written notice is constitutionally required. *Flaim*, 418 F.3d at 635 (citing *Goss v. Lopez*, 419 U.S. 565, 584 (1975)). A harsh sanction, like termination, may require more formal procedures such as informing the accused of the charge, the policies or regulations the accused is charged with violating, and a list of possible penalties. *Id.* If the Court were to entertain the fiction that the University did not terminate Frost pursuant to a violation of the Sexual Harassment Policy, Frost certainly wasn't provided notice of the policies or regulations that was he was charged with violating. Even without entertaining that

fiction, the University's notice was likely inadequate because it failed to provide notice prior to his actual termination that Frost was being charged with "incompetence and/or neglect of and/or refusal to perform your duty and/or immoral conduct, as contemplated by Section 4.5.3." Termination Letter, 21-18, at 2. This deprived Frost of the opportunity to present his side of the story to his employer, as he was not made aware of the policies he was charged with violating until his termination on January 28, 2019.

Overall, given the University's failure to provide Frost an opportunity for cross-examination prior to his termination in direct contravention of Sixth Circuit precedent, or meaningful notice to enable him to respond to the charges against him, the Court finds that Frost has met his burden of showing substantial likelihood of success on the merits of his § 1983 claim based on deprivation of a protected property interest without due process.[1]

### ii. Liberty Interest Claim

Frost also contends that Defendants deprived him of his liberty interest in his good name and reputation by disseminating the termination letter which included stigmatizing statements, including that Frost engaged in "immoral" conduct, "inappropriate physical conduct toward a student," and declared Frost a "*persona non gratis.*"

The Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in their "reputation, good name, honor, and integrity." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (internal quotation marks and citation omitted). The Sixth Circuit has established

---

[1] Frost also claims he has a property interest in his position as an advisor to students and operator of his research lab, both of which are necessary to his scholarship and standing in the academic community. In support of this argument, Frost relies on the plaintiff's theory as approved by the Sixth Circuit in *Yashon v. Gregory*, 737 F.2d 547, 555 (6th Cir. 1984) (explaining approvingly that plaintiff's theory was "simply [] that he and other attending medical staff members relied upon an understanding with the defendants that tenured faculty status and hospital privileges would be linked"). In light of the Court's finding that Frost is likely to succeed on the merits of his due process claim based on his property interest in his tenure-track appointment, the Court declines to address this additional argument at this juncture.

five factors that a plaintiff must show in order to establish that he was deprived of a liberty interest and entitled to a name-clearing hearing:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment.... Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.... Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Id.* at 320 (quoting *Brown v. City of Niota*, 214 F.3d 718, 722–23 (6th Cir. 2000)). "Once a plaintiff has established the existence of all five elements, he is entitled to a name-clearing hearing if he requests one." *Id.* (internal quotation marks and citation omitted).

However, the Sixth Circuit has made clear that, because it is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process, a plaintiff *must request a name-clearing hearing prior to bringing suit*. *Id.* at 320–21. *See also Helm v. Eells*, 642 F. App'x 558, 566 (6th Cir. 2016) (professor's failure to request a name-clearing hearing is fatal to his liberty interest claim); *Brown v. City of Niota*, 214 F.3d at 723 (rejecting plaintiffs' liberty interest claims because, although the plaintiffs clearly had requested a name-clearing hearing, the request had not been denied before they filed suit); *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410–11 (6th Cir. 1997) (affirming dismissal of plaintiff's liberty interest claim on the grounds that plaintiff's failure to request a name-clearing hearing was fatal to his claim).

Nowhere does Frost allege that he has requested a name-clearing hearing. Since failure to request a name-clearing hearing is fatal to a liberty interest claim, Frost is unlikely to succeed on the merits of his liberty interest claim.

### B. Irreparable Harm.

The next factor Frost must show is whether, absent the preliminary injunction, he will suffer some irreparable injury. When a plaintiff demonstrates a likelihood of success on the merits

of a constitutional deprivation claim, it follows that he or she will suffer irreparable injury absent injunctive relief.  *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *Miller v. Davis*, 123 F. Supp. 3d 924, 937 (E.D. Ky. 2015) ("[T]he denial of constitutional rights, enumerated or unenumerated, results in irreparable harm").

In addition to finding a violation of a constitutional right constitutes irreparable harm, the Court agrees with Frost that monetary damages cannot compensate the loss of Frost's standing in the academic community.  *See generally Doe v. Univ. of Cincinnati*, 872 F.3d at 407 (noting that without the injunction student would be suspended for a year and suffer reputation harm both on and off campus based on a finding rendered without due process).  Therefore, the Court finds that Frost has demonstrated that he will suffer irreparable injury if an injunction does not issue.

### C.  Irreparable Harm to Others and Public Interest

The final factor the Court must consider is whether issuance of the injunction would cause irreparable injury to others and whether an interest would serve the public interest.   Defendants argue that the public interest would suffer if an injunction were to issue because the University has an interest in enforcing its Sexual Harassment Policy and the tenets of the *Redbook* to ensure the policies are followed consistently.  Defendants argue that reinstating Frost would send the message that the University condones unwelcomed and unwanted behaviors and endorses faculty members drinking with students.

As discussed previously, the Court is mindful of the University's interest in enforcing its Sexual Harassment Policy.  But an injunction does not mean the University must abandon its policies and cannot investigate complaints of sexual harassment.  The Sixth Circuit has held that a university bears a "minimum burden" by allowing cross-examination where competing narratives exist in a charge of sexual harassment.  *Baum*, 903 F.3d at 582.  Moreover, "it is always in the public's interest to prevent a violation of an individual's constitutional rights."  *Doe v. Univ. of Cincinnati*, 872 F.3d at 407.  At most, this factor is neutral.

### D.  Permanent Injunction

In addition to requesting a preliminary injunction, Frost also requests a permanent injunction against Defendants.  Federal Rule of Civil Procedure 65 permits a court to consolidate its consideration of a preliminary injunction with the merits.  The Court, however, declines to rule on Frost's motion for a permanent injunction at this stage.  Therefore, Frost's motion to the extent is seeks a permanent injunction will be **DENIED WITHOUT PREJUDICE**.

### V.  CONCLUSION

Upon careful consideration of the entire record in this case to date, and for all of the reasons stated herein, the Court finds that Frost has met his burden of demonstrating that he is entitled to preliminary injunctive relief, that he should be fully reinstated to his tenure-track position, and that he is highly likely to succeed on the merits of this case.  The Court will issue an injunction as it sees necessary to preserve the status quo of the parties.  *See Univ. of Texas*, 451 U.S. at 395 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

A separate order will be entered in accordance with this opinion.

May 29, 2019

Charles R. Simpson III, Senior Judge
United States District Court