UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | |
|---|---|
| DR. CHRISTOPHER FROST ) | |
|    Plaintiff ) | Case No. 3:19-cv-00227-CRS |
| ) | |
| v. ) | |
| ) | |
| UNIVERSITY OF LOUISVILLE, *et al.* ) | |
|    Defendants ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

On April 30, 2019, Plaintiff Dr. Christopher Frost ("Frost"), a tenure-track professor at Defendant University of Louisville (the "University"), moved for a preliminary injunction restoring him to his tenure-track appointment because the University, he claimed, deprived him of protectable property and liberty interests without due process of the law under 42 U.S.C. § 1983. *See* Plaintiff's Amended Motion for Preliminary and Permanent Injunction ("Plaintiff's Motion"), DE 21. On May 8, 2019, the University filed a response in opposition. *See* Response in Opposition to Motion for Preliminary and Permanent Injunction ("University's Response"), DE 22. On May 29, 2019, this Court entered a memorandum opinion and order granting, in part, and denying, in part, Frost's motion for preliminary injunction, and immediately restoring Frost to his appointment. *See* Memorandum Opinion, DE 26; Order, DE 27.

Pursuant to Rule 62(d) of the Federal Rules of Civil Procedure and Rule 8(a)(1) of the Federal Rules of Appellate Procedure, the University seeks a stay of the injunction pending its interlocutory appeal of the Court's memorandum opinion and order to the Sixth Circuit Court of Appeals.

**ARGUMENT**

**I.      This Court has the Authority to Stay the Preliminary Injunction Pending Appeal.**

Rule 62(d) of the Federal Rules of Civil Procedure states that, "While an appeal is pending from an interlocutory order . . . that grants . . . an injunction," this Court has the authority to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed.R.Civ.P. 62(d).  Furthermore, pursuant to Rule 8(a)(1) of the Federal Rules of Appellate Procedure, "A party must ordinarily move first in the district court" for "a stay of the judgment or order of a district court pending appeal" or "an order suspending, modifying, restoring, or granting an injunction while an appeal is pending." Fed.R.App.P. 8(a)(1).

When determining whether to grant a stay of an injunction, courts examine four factors: (1) the likelihood the movant will prevail on the merits of its appeal; (2) the likelihood the movant will be irreparably harmed absent a stay; (3) the prospect others will be harmed if the court grants the stay; and (4) the public interest in granting the stay. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). These factors are not prerequisites that the movant must meet in order to be granted a stay; but instead, the Court considers the factors as interrelated considerations that must be balanced together. *Mich. Coal. of Radioactive Material Users, Inc.*, 945 F.2d at 153; *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985); *Leiva-Perez v. Holder,* 640 F.3d 962, 970 (9th Cir. 2011) (citing *Nken v. Holder,* 556 U.S. 418, 433-34 (2009)). A movant meets this standard if it "demonstrates irreparable harm that decidedly outweighs any potential harm to the [nonmoving party] if a stay is granted" and "at a minimum, 'serious questions going to the

merits.'" *Mich. Coal. of Radioactive Material Users, Inc.*, 945 F.2d at 153 (quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

As demonstrated below, the balance of these factors favors granting a stay of this Court's injunction order.

**II.     The University and Its Students, Faculty, and Staff Have Been, And Will Continue To Be, Irreparably Harmed Absent a Stay.**

The University and its students, faculty, and staff, have been, and will continue to be, irreparably harmed absent a stay of the Court's order enjoining it to reinstate Frost. The Sixth Circuit has recognized that institutions of higher learning, such as the University, have an interest in "creating an atmosphere free of faculty disruption." *Bonnell v. Lorenzo*, 241 F.3d 800, 824 (6th Cir. 2001). Furthermore, "[a] college's or university's interest in maintaining a hostile-free learning environment, particularly as it relates to its Title IX funding, is well recognized." *Id*. A university is also harmed where ordering a professor's return to the classroom unduly interferes in a university's judgment about how best to protect the safety of its students. *See Heineke v. Santa Clara Univ.*, No. 17-CV-05285-LHK, 2018 U.S. Dist. LEXIS 114737, at *49-50 (N.D. Cal. July 10, 2018). Ordering the reinstatement of a professor accused of sexual misconduct "also would likely cause victims of sexual misconduct—be they students, staff, or faculty—to question whether [the university] would take any meaningful action in response to future complaints." *Id*. Finally, where a teacher has been accused of violating school policies, ordering the teacher's return to the classroom causes irreparable harm by putting other students at risk of future violations. *See id.* (*citing Singh v. School Dist. of Phila.*, 2010 U.S. Dist. LEXIS 81851, 2010 WL 3220336, at *13 (E.D. Pa. Aug. 11, 2010) ("The harm to [the teacher] is outweighed by the risk of placing a teacher with violations of school policy back in [the school's] learning environment.")).

Here, the Court's entry of the Order temporarily reinstating Frost has caused, and will continue to cause, significant faculty disruption and harm to students as it requires the University to allow a professor who has been found to have violated the University's sexual harassment policy and who engaged in unwanted, inappropriate physical conduct toward a student, to return to a position that requires daily contact with the University's students, faculty, and staff. The Court's order has placed the University in the extraordinarily difficult situation of accommodating Frost—who made the sexual harassment allegations against him public through this lawsuit—while also ensuring that students, faculty, and staff who are uncomfortable with his presence are provided a hostile-free learning and working environment. Indeed, students have already communicated to the University that they are not comfortable working with Frost. So far, the University has been able to make temporary arrangements to alter the students' course schedule or research, but the injunction prevents the University from providing a hostile-free learning and working environment to the students who have already expressed fear about learning under, working with, or coming into contact with Frost on campus.

More importantly, the University cannot cure the chilling effect that the injunction will have – and has potentially already had – on students, faculty, or staff. Those who previously felt comfortable raising complaints of what they perceived as or believed was sexual harassment or physically inappropriate conduct will now be left to wonder if their allegations will lead to a lawsuit or ultimately withstand judicial scrutiny, before making any complaints or reports. In fact, because of the injunction, students may never make complaints of sexual harassment against a faculty or staff member knowing they will be subject to rigorous cross examination by their harassers. This potentially puts professors – who are inherently in a position of power – into a position where they can intimidate and threaten students further.

The injunction also effectively prohibits the University's impartial investigators from conducting investigations and making factual findings. Likewise, it strips the University's power to address complaints of alleged sexual harassment by professors and staff members or to make decisions based on conduct the University deems inappropriate and unfitting of a professor. Complainants will now indefinitely question whether to report sexual harassment if they believe that the University cannot take meaningful action to prevent it. These issues will persist as long as Frost is reinstated, and it is simply not possible for the University to balance its obligation to provide a safe and hostile-free environment to its students, faculty, and staff while also complying with the injunction.

Finally, directing the University to return Dr. Frost to the 'status quo' is a fluid concept in the world of university professorships, and as a practical matter can create a substantial risk that the University will unintentionally fail to comply with the status quo as it exists in other employment settings. For example, teaching assignments, allocation of time to service, and other subjects covered in an Annual Work Plan typically require collaboration and ongoing dialogue to meet the University's ever-changing needs. These arrangements are also typically made long before the end of a semester so students can make class selections long before the upcoming term. While the University intends to treat Dr. Frost as it does any other professor, it cannot offer new classes for Dr. Frost to teach after students have already made their selections for course work and it cannot punish other faculty members by reassigning Dr. Frost to teach their classes. Further, while the University will work to ensure Dr. Frost's classes are within his area of expertise, teaching and preparing for new coursework is expected of any faculty member, including Dr. Frost. This may mean teaching a particular class that Dr. Frost may not have taught in the past--maintaining the status quo does not mean relieving Dr. Frost of expectations to

which others are held accountable. But in the context of this lawsuit, maintaining the 'status quo' could confusingly create the potential for unwarranted preferential treatment, or unwarranted claims of retaliation.

Accordingly, this Court should stay its order temporarily reinstating Frost pending the University's appeal of that order to prevent any further irreparable harm to the University and its students, faculty, and staff.

### III. A Stay Will Cause Minimal Harm to Frost.

Any harm to Frost from a stay of the Court's order pending appeal will be minimal as a stay will simply restore the *status quo ante* between Dean Kempf-Leonard's January 28, 2019 letter and entry of the Court's order on May 29, 2019. As of January 28, 2019, Frost was placed on administrative leave and prohibited from coming on campus absent explicit University permission and supervision.

Since that time, including after Frost filed his Complaint on March 27, 2019, the University has accommodated numerous requests from Frost to come on campus for various reasons, including accessing his office to complete tasks related to his NSF Grant and to attend events for his children. There is no reason why the parties cannot return to this state of affairs—which balances Frost's limited needs to access his campus office with the University's strong interest in protecting its students, faculty, and staff—during the pendency of the University's interlocutory appeal of the Court's order reinstating Frost.

Further, the harm to Frost from remaining off-campus is particularly minimal given that Frost has no teaching duties during the current summer term. Students have continued work on Dr. Frost's research. Thus, Dr. Frost does not actually need regular access to campus. Likewise, Dr. Frost is not currently scheduled to teach any classes in the Fall. If, however, the Court's

order is affirmed by the Sixth Circuit, the Department Chair and Dean will have an opportunity to work on an Annual Work Plan for Dr. Frost regardless of the timing.

Accordingly, this Court should stay its order temporarily reinstating Frost pending the University's interlocutory appeal to the Sixth Circuit.

### IV. The University Is Likely to Succeed On the Merits of Its Appeal.

In order to justify a stay of an injunctive order, movant needs to demonstrate more than the mere "possibility" of success on the merits. *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 n. 4 (6th Cir. 1977). This is not a high standard; the movant only needs to establish a "minimum quantum of likely success." *Leiva-Perez*, 640 F.3d at 967-968; *Ohio ex rel. Celebrezze*, 812 F.2d 290 (6th Cir. 1987); *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). The Courts do not require that the movant establish that "it is more likely than not that [it] will win on the merits," but the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury that the movant will suffer absent the stay. *Leiva-Perez,* 640 F.3d at 966; *Ohio ex. rel. Celebrezze*, 812 F.2d at 290.

Alternatively, the Courts have found that the movant established the possibility of success on the merits when the injunction was granted pursuant to a novel legal theory or when the petitioner's theory raises serious legal questions. See *Silverman v. 40-41 Realty Associates, Inc.*, 448 F.2d 678 (2d Cir. 1982) (vacated injunctive relief since Board's petition was based on a novel legal theory); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2014 U.S. Dist. LEXIS 83038 (N.D. Cal. 2014) (stay appropriate if movant demonstrates that serious legal questions are raised and the balance of hardships tips sharply in its favor).

Here, the University has at least a "minimum quantum of likely success" on the merits of its appeal because the error it alleges is: (1) that Frost had a protectable property interest in his

7

probationary tenure-track appointment; and (2) that Frost did not receive due process under the Fourteenth Amendment.

> **A.  Frost Had A Vested Contractual Right, Not A Constitutionally Protected Property Interest, In His Appointment for the 2018-2019 and 2019-2020 Academic Years That Could Be Adequately Compensated By Money Damages In A Breach of Contract Action.**

The Court's Memorandum Opinion determined that Frost had a constitutionally-protected property interest, rather than a mere contractual right, in his probationary tenure-track appointment at the University for the 2018-2019 and 2019-2020 academic years. The Court held that "[o]nce the University decided to renew Frost's tenure-track term for the 2018-2019 academic year, Frost's *property interest* in that continued employment vested and he could not be terminated prior to the completion of that term but for cause pursuant to Section 4.5.3 of the *Redbook*." Memorandum Opinion, DE 26, at 14 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972); *Silitonga v. Ky. State Univ.*, 2018 U.S. Dist. LEXIS 109610 (E.D. Ky. June 30, 2018)) (emphasis added). Furthermore, the Court held that "Frost's interest in the 2019-2020 term vested when the University did not notify him otherwise by June 30, 2018." *Id*., at 15.

But the University contends the above findings are contrary to binding Sixth Circuit law holding that premature dismissal under a contract of employment for a fixed period of time does not give rise to a federal cause of action under 42 U.S.C. § 1983, but rather is redressed by an ordinary breach of contract action. *See Ramsey v. Bd. of Educ.*, 844 F.2d 1268 (6th Cir. 1988). In *Ramsey*, the Sixth Circuit held:

> [E]ven when a person's means of livelihood is connected to the deprivation claim, due process does not always require a predeprivation hearing or support a section 1983 action when any interest in employment is affected. ***When a person is hired for a fixed period of time or pursuant to a contract providing for employment "at will" or impliedly subject to removal upon the bona fide elimination of the position, and that person is***

8

> *dismissed prematurely, no federal cause of action lies under section 1983 to redress what is best characterized as an ordinary breach of contract.* [citations omitted] This is due to the fact that a nontenured employee's property interest in continued employment is created and defined by the employee's contract. *The employee has a property interest in employment for the duration of the employment contract, but the deprivation of that finite interest can be compensated adequately by an ordinary breach of contract action.* Conversely, the tenured employee who loses his or her position by a premature breach of contract has suffered the loss of a property interest that, because of its special nature, is neither easily defined nor easily compensated by a typical breach of contract action.

844 F.2d at 1273-74 (emphasis added).

Here, Frost is a probationary, non-tenured appointee whose employment is expressly terminable without cause per the *Redbook*. The March 13, 2015 letter of appointment stated that the termination of Frost's appointment would be subject to the *Redbook*. Section 4.5.2 of the *Redbook*, "Probationary Academic Appointments," requires only "twelve months [notice] before the expiration of the appointment" to appointees with more than two years at the University. This provision does not require cause for the termination and contemplates that a probationary appointee may be terminated for no reason whatsoever, at the discretion of the University. Thus, *regardless of whether the University actually terminated Frost pursuant to Section 4.5.2 or not*, the fact that Frost *could have been* terminated without cause pursuant to this provision establishes that he had no constitutionally-protected property interest in his appointment. *See Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997) ("Inasmuch as Bailey was a non-tenured employee under Kentucky law with no contractual right to continued employment, she failed to establish a property interest protected by the due process clause.")

Even accepting as true that the University's failure to provide Frost 12-months' notice of the non-renewal of his probationary tenure-track appointment for the 2019-2020 academic year

9

by June 30, 2018 created a "vested interest," Frost's "vested interest" extended, at most, through the end of the 2019-2020 academic year. Although the January 28, 2019 letter from Dean Kimberly Kempf-Leonard purported to terminate Frost effective June 30, 2019, the letter unquestionably put Frost on notice that his appointment beyond the 2019-2020 academic year would not be renewed. *See* January 28, 2019 Letter, DE 10-2. Thus, whatever Frost's "vested interest" in his continued employment by the University, that interest was for a ***fixed period of time***—it could not extend beyond May 31, 2020, the last day of the 2019-2020 academic year. Beyond that date, Frost had no reasonable expectation of continued employment, much less being considered for or receiving tenure.

The application of *Ramsey* here is straightforward. As set forth above, Frost's employment is governed by the *Redbook*, which provides for non-renewal without cause, and his employment is for a fixed period of time—it will end no later than May 31, 2020. Therefore, even though Frost's employment was terminated prematurely, "no federal cause of action lies under section 1983 to redress what is best characterized as an ordinary breach of contract." *Ramsey*, 844 F.2d at 1273. The University's deprivation of Frost's finite interest in his employment through May 31, 2020 "can be compensated adequately by an ordinary breach of contract action." *Id*. Accordingly, it was error to hold that Frost had a constitutionally-protected property interest—rather than a mere contractual right—in his continued employment by the University.

### B. Frost Received All Process Due To Him Under the Fourteenth Amendment.

It was also error to find that the University deprived Frost of his protected interest without due process of law by (1) failing to afford him the opportunity to cross-examine his

10

sexual harassment accuser in a pre-deprivation hearing; and (2) failing to provide adequate notice of the grounds for his termination. *See* Memorandum Opinion, DE 26, at 15-20.

First, in finding that the University was required to provide Frost the opportunity to cross-examine his accuser, the Court relied upon the Sixth Circuit's opinion in *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018). Simply put, *Baum* has no application to this case because the University did not "choose between competing narratives," 903 F.3d at 578, or take any action against Frost based on the January 14, 2019 Case Summary Report's finding that Frost violated the University's sexual harassment policy. In *Baum*, a student was found to have violated a university's "sexual misconduct" policy and suspended as a result of a determination that the accuser and her witnesses were "more credible" than the accused and his. *See id.*, at 581-82. Here, unlike in *Baum*, the conclusions of the January 14, 2019 Case Summary Report and the actions set forth in Dean Kempf-Leonard's January 28, 2019 letter were ***not grounded in a credibility determination***. Also unlike *Baum*, the actions taken against Frost set forth in Dean Kempf-Leonard's January 28, 2019 letter ***were not based on the Case Summary Report's conclusion that Frost violated the University's sexual harassment policy***.

The Case Summary Report concluded that Frost violated the University's sexual harassment policy because he engaged in <u>unwelcome and unwanted</u> "physical conduct" with his accuser, Jane Doe. *See* Case Summary Report, DE 4-1, at PageID 99. During his interview, ***Frost admitted*** that he engaged in physical conduct with Doe. The undisputed facts are that Doe drank bourbon at Frost's house, became ill, and that Doe threw up in his bathroom ***while Frost "held her hair back and rubbed the top of her back."*** Agreed Stipulation of Facts, DE 19, at ¶¶ 8-9. Thus, Frost admitted the exact misconduct—***unwanted physical conduct*** towards Doe—that

was the basis of the January 14, 2019 Case Summary Report conclusion that Frost violated the University's sexual harassment policy.

Frost's admissions were also the sole basis for Dean Kempf-Leonard's January 28, 2019 letter placing Frost on paid administrative leave and terminating his probationary appointment. Dean Kempf-Leonard cited the following conduct as the basis for her recommendation: (1) Frost hosted an event with students in which they were invited to, and did in fact, consume alcohol; (2) Frost provided Doe alcohol; and (3) Frost engaged in unwelcome physical conduct with Doe. *See* January 28, 2019 Letter, DE 10-2. Again, ***Frost admitted to all of this conduct in his interview***. *See* Agreed Stipulation of Facts, DE 19, at ¶¶ 6-9. Unlike in *Baum*, Dean Kempf-Leonard's letter was <u>not</u> premised upon the finding that Frost violated the University's sexual harassment policy—only that he engaged in the exact conduct to which he admitted.

The Sixth Circuit reiterated in *Baum* that "[t]his court has long held that ***cross-examination is unnecessary if a student admits to engaging in misconduct. . . . After all, there is little to be gained by subjecting witnesses to adversarial questioning when the accused student has already confessed***." 903 F.3d at 584 (emphasis added) (citing *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (holding that cross-examination is not necessary where the accused admitted the conduct giving rise to his termination and was "unable to identify any benefits that cross-examination would have provided at his hearing (not to mention the administrative burden and expense) other than the assertion that he could have identified discrepancies in the [witness'] testimony.")) The same holds true for professors who confess to physical misconduct with a student. There was nothing to be gained from allowing Frost to cross-examine his accuser – other than intimidating and chastising her for making the complaint – because he had already admitted to the physical conduct that was the basis of the Case

12

Summary Report's conclusions and the basis of Dean Kempf-Leonard's January 28, 2019 letter. Frost did not identify any additional witnesses, produced no affidavits, and did not provide any documentation that contradicted the conduct that was the basis of the Case Summary Report and Dean Kempf-Leonard's letter. Accordingly, the facts of the instant case are fundamentally different than *Baum*, and it was error to rely upon *Baum* in concluding that Frost was entitled to cross-examine Doe.

Second, the Court found that the University provided insufficient notice to Frost of "the policies or regulations that he was charged with violating" prior to Dean Kempf-Leonard's January 28, 2019 letter. *See* Memorandum Opinion, DE 26, at 19-20. The Court's analysis requires the University's pre-termination notice to have given Frost notice of the ***exact policies or regulations*** that he was charged with violating, ignoring that Frost had waived his procedural due process claim by refusing to participate in the post-termination grievance procedure offered by the University.

But the Sixth Circuit has held that due process "***does not require exacting specificity*** in the provision of oral or written notice," *Devlin v. Kalm*, 531 F. App'x 697, 708 (6th Cir. 2013) (*citing Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)); rather, a sufficient pre-termination notice "***only requires sufficient notice to prevent surprise at the termination and its justification***." *Id*. (*citing Bramley v. Knudson*, 1990 U.S. App. LEXIS 19682, at *3 (6th Cir. 1990)). Here, Frost unquestionably received sufficient notice to prevent surprise at his termination and its justification. Dean Kempf-Leonard's January 28, 2019 letter was based on three facts: (1) that Frost hosted an event with students in which they were invited to, and did in fact, consume alcohol; (2) that Frost provided Doe alcohol; and (3) that Frost engaged in unwelcome physical conduct with Doe. *See* January 28, 2019 Letter, DE 10-2. Frost was notified

13

of ***these three exact factual allegations*** in an email from Schroeder on November 7, 2018, which stated that the sexual harassment complaint against Frost was "based on gender/sex" and contained allegations that: (1) Frost hosted a potluck at his house in the summer to which students were invited; (2) alcohol was served; and (3) inappropriate touching occurred. *See* Agreed Stipulation of Facts, DE 19, at ¶ 13.

Furthermore, Ernst and Schroeder interviewed Frost in-person about these the allegations on November 5, 2018. Thus, Frost could not have possibly been surprised by Dean Kempf-Leonard's January 28, 2019 termination letter or its justification, which is all that is required to satisfy due process. *See Bramley*, 1990 U.S. App. LEXIS 19682, at *3. The Court dismissed the importance of the November 5, 2018 interview and November 7, 2018 email because the University did not terminate Frost based on the Case Summary Report or a violation of the University's sexual harassment policy, *see* DE 26, at 19, but that fact is irrelevant to whether Frost received sufficient pre-termination notice. As set forth above, there is no question that Frost was on notice of the factual allegations that were the basis for his termination. Accordingly, the Court erred in determining that the University's pre-termination notice to Frost was constitutionally insufficient.

Third, the Court erred in failing to apply clear Sixth Circuit law holding that "where the employee refuses to participate or chooses not to participate in the post-termination proceedings, then the employee has waived his procedural due process claim." *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004) *(citing Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 904 (8th Cir. 2000)). It is undisputed that Frost has failed to participate in the post-termination grievance procedures outlined in Dean Kempf-Leonard's January 28, 2019 termination letter. *See* Agreed

Stipulation of Facts, DE 19, at ¶ 30. Accordingly, under binding Sixth Circuit precedent, Frost waived his right to pursue a procedural due process claim.

Finally, the Court found that the actual "deprivations" involved here—with respect to both the Case Summary Report and Dean Kempf-Leonard's January 28, 2019 letter—were minimal. *See Estep v. City of Somerset*, Civil Action No. 10-286-ART, 2011 U.S. Dist. LEXIS 23486, at *15 (E.D. Ky. Mar. 8, 2011) ("The less serious the deprivation and the more consequential the governmental interest, the less 'process' is 'due.'") But the only "deprivation" related to the Case Summary Report was the issuance of the report itself, and the fact that it apprised the Dean of Frost's actions at the July 7, 2018 social gathering. The University took no other formal action based on the Case Summary Report or the finding that Frost violated the Sexual Harassment Policy. To the extent the Case Summary Report informed Dean Kempf-Leonard's decision to recommend that Frost's appointment be terminated, the deprivation was still minimal—it was, at most, Frost's right to work through the six months of the 12 months of notice required by the *Redbook*. These minimal "deprivations" do not support Frost's request for injunctive relief or the provision of additional process, especially where, as here, Frost chose not to participate in the robust post-termination procedures offered to him.

**V.     The Public Interest Favors Granting a Stay.**

Finally, the public interest strongly favors granting a stay of the Court's order temporarily reinstating Frost. The public has an interest in preventing sexual harassment and in allowing the University to make personnel decisions, so long as those personnel decisions do not violate the law. *See Heineke*, 2018 U.S. Dist. LEXIS 114737, at *54 (*citing Doe v. George Wash. Univ.*, 305 F. Supp. 3d 126, 130 (D.D.C. 2018) (recognizing public interest in university's ability to independently investigate and discipline students for misconduct); *Marshall v. Ohio Univ.*, 2015

U.S. Dist. LEXIS 31272, at *10 (S.D. Ohio Mar. 13, 2015) (observing that, absent a showing of likely success on the merits, the court is reluctant to interfere with disciplinary processes); *Ben-Yonatan v. Concordia Coll. Corp.*, 863 F. Supp. 983, 988 (D. Minn. 1994) (recognizing public interest in harassment-free educational environment)).

For the reasons stated herein, the University is likely to succeed on the merits of its appeal that Frost's constitutional rights were not violated by the University's termination procedure. As such, the public interest is best served by preserving confidence in the University's termination procedure, *see Singh*, 2010 U.S. Dist. LEXIS 81851, at *39, and in sending the message that the University takes faculty misbehavior seriously regardless of whether or not it amounts to sexual harassment under the law.

Accordingly, because the University has shown a likelihood of success on the merits of its appeal and the public has an interest in preventing sexual harassment and upholding the University's constitutional termination procedures, a stay of the Court's order is in the public interest.

## CONCLUSION

The University has satisfied each of the four required elements required for a stay: the University has a likelihood of success on the merits of its appeal that Frost's termination was not a violation of his constitutional rights; the University and its students, faculty, and staff have been, and will continue to be, irreparably harmed absent a stay; Frost will be minimally harmed by a stay; and the public interest favors granting a stay. Accordingly, this Court should stay its order granting Frost a preliminary injunction [DE 27] pending the University's interlocutory appeal of that order to the Sixth Circuit.

Respectfully submitted,

/s/ Alina Klimkina
Philip Longmeyer
Alina Klimkina
Daniel O'Gara
Dinsmore & Shohl LLP
101 South 5th Street, Suite 2500
Louisville, Kentucky 40202
(502) 540-2300
philip.longmeyer@dinsmore.com
alina.klimkina@dinsmore.com
daniel.ogara@dinsmore.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on this 7th day of June, 2019, via the Court's ECF system and email, upon:

R. Gregg Hovious
Loren T. Prizant
Matthew P. Dearmond
MIDDLETON REUTLINGER
401 South 4th Street, Suite 2600
Louisville, KY 40202
(502) 584-1135
ghovious@middletonlaw.com
lprizant@middletonlaw.com
mdearmond@middletonlaw.com

and

Mary E. Eade
Jason M. Nemes
914 Lily Creek Rd., Ste 202
Louisville, KY 40243
(502) 792-0350
meade@nemes-eade.com
jnemes@nemes-eade.com

*Counsel for Plaintiff*

/s/ Alina Klimkina
*Counsel for Defendants*