UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| DR. CHRISTOPHER FROST<br>    Plaintiff | ) | |
| | ) | |
| | ) | Case No. 3:19-cv-00227-CRS |
| v. | ) | |
| | ) | **RESPONSE IN OPPOSITION TO** |
| UNIVERSITY OF LOUISVILLE, *et al* | ) | **MOTION TO STAY [DN 31]** |
|     Defendants | ) | |
| | ) | |

## INTRODUCTION

This Court issued its May 29, 2019 Order For Preliminary Injunction based upon joint stipulations of fact and well-settled, binding precedent. The University of Louisville has not demonstrated that this Court erred as a matter of law.  As a result, its Motion To Stay (DN 31) not only should be but also must be denied.

The Preliminary Injunction ordered the full reinstatement of Dr. Frost "to his probationary, tenure-track appointment as an Assistant Professor of Biology in the College of Arts and Sciences," DN 27 at 1, as "necessary to preserve to the status quo."  DN 26 at 23. Although couched as a Rule 62 motion for a stay, in truth, the motion seeks reconsideration and reversal. The University has merely repeated the same arguments it made in opposition to Dr. Frost's Motion for injunctive relief based upon the same stipulated facts.  Thus, the University has not demonstrated the "likelihood of reversal" necessary to issuance of a stay.  *Mich. Coal of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).  While the University cites *Griepentrog* for the standard governing Rule 62 motions, it omits any reference to this high burden of proof.  DN 31-1 at 2-3.

Similarly, the University has omitted any reference to the limited scope of this Court's jurisdiction in ruling on Rule 62 motions.  Federal courts have interpreted Rule 62 narrowly, rejecting motions that are (1) filed under the aegis of Rule 62 but which are in truth Rule 59(e) motions, (2) filed after an appeal and seek relief that would alter the status quo of the parties and (3) filed after an appeal and seek relief that would destroy the integrity of appeal. The University's Motion runs afoul of each of these restrictions of this Court's power under Rule 62. For this reason alone, its Motion must be denied.

## ARGUMENT

### A.  This Court cannot grant the relief the University seeks.

"The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).  That is, once an appeal is filed, jurisdiction over all matters from which an appeal is taken is transferred to the court of appeals.  *Zundel v. Holder*, 687 F.3d 271 (6th Cir. 2012) (effective notice of appeal divests district court of jurisdiction over matter forming basis for appeal).  Thus, a district court may not take any action that would "alter the status of the case as its rests before the Court of Appeals." *Dayton Indep. School Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir.1990); *accord U.S. v. Gallion*, 534 Fed. App'x 303 (6th Cir. 2013); *see also Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dept. of Natural Res.*, 71 F.3d 1197 (6th Cir. 1995) (appeal divests district court of jurisdiction to act in case except on remedial matters unrelated to merits of appeal); *NLRB v. Cincinnatit Bronze*, 829 F.2d 585, 588 (6th Cir. 1987) (appeal divests district court of jurisdiction over the matter forming the basis for the appeal).

Accordingly, while FED. R CIV. P. 62 vests some residual jurisdiction with this Court with respect to the Preliminary Injunction it issued, the Court's power to modify that injunction is limited.  Federal courts have applied two standards to Rule 62(d) motions, creating a circuit split.  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 513 (6th Cir. 1992).  One view is that this Court's power "to modify a preliminary injunction . . . is limited to modifications that preserve the status quo" of the parties as it is before the Court of Appeals.  *Id.* (citing *Coastal Corp. v. Texas E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (authority provided by Rule 62 is limited to preservation of status quo).  In *Coastal*, the district court awarded a preliminary injunction but while the decision was on appeal, the district court dissolved the injunction based on newly discovered evidence.  The court of appeals reversed the dissolution, holding that the "powers of the district court over an injunction pending appeal should be limited to maintaining the status quo and ought not to extend to the point that the district court can divest the court of appeals from jurisdiction while the issue is before us on appeal."  869 F.2d at 820.

The other interpretation of Rule 62 comes from *Ortho Phar. Corp. v. Amgen, Inc.*, 887 F.2d 460, 464 (3rd Cir. 1989) which held generally that a Rule 62 order cannot undermine the integrity of an appeal.  More specifically, the Third Circuit held that a district court's power to modify an injunction is not "open ended." *Id.* (citing *Griggs*, 459 U.S. at 58)).  Rather, a district court is limited to actions that are designed to "preserve the integrity of the proceedings in the court of appeals." *Id.*  Of equal importance, the Third Circuit held that "absent some change in circumstances, a movant ought not to be able to file a motion under the aegis of Fed. R. Civ. P. 62(c) and [re-litigate][1] the 'original issue' simply because the case involves preliminary injunctive relief." *Id.* at 463.   Stated another way, Rule 62 does not confer authority on a district

---

[1] The opinion as published in Westlaw's database reads "religate," a typographical error.
[2] The University's Memorandum of Law, DN 31-1 at 8.

court by which "to simply reconsider[ ] its earlier order as in a motion under Fed. R. Civ. P. 59(e)". *Id.* at 464.

The Sixth Circuit has not expressly adopted either standard. *Basicomputer*, 973 F.2d at 513. Even so, under either standard, a district court may not materially alter the status of a case that is on appeal. *Gallion*, 534 Fed. App'x 303; *Fort Gratiot*, 71 F.3d 1197; *N.L.R.B.,* 829 F.2d 585. The Fifth Circuit's standard comports with this limitation by holding that any order entered pursuant to Rule 62 must maintain the status quo. The Third Circuit's standard likewise precludes reconsideration, or re-litigation, of a district court's original order and restricts the scope of Rule 62 orders by requiring that they preserve the integrity of the appeal. Accordingly, under either standard, a district court may not act so as affect the merits of an appeal by reconsidering and reversing its decision. District courts within the Sixth Circuit have reached this conclusion: "[e]ither way Rule 62(c) is not an invitation to reconsider the merits of the injunction, and any action taken pursuant to the rule may not 'materially alter the status of the case on appeal.'" *Furwa v. Operating Eng'rs Local 324 Health Care Plan*, 2009 WL 367179 at *5 (E.D. Mich. Jan. 30, 2019) (citations omitted); *see also Graveline v. Johnson*, 2018 WL 4184577 at *2 (E.D. Mich. Aug. 30, 2018); *Geo. S. Hofmeister Family Trust v. Trans Indus. of IN., Inc.*, 2007 WL 128932 at *2 (E.D. Mich. Jan. 12, 2007).

The University's Motion seeks exactly what this Court cannot do: a reversal on the merits of its original decision to issue the Preliminary Injunction. The University's Motion contains the same arguments it made in opposition to Dr. Frost's Motion for injunctive relief. In response to Dr. Frost's Motion for injunctive relief (DN 21), Defendants (including the University) argued: (1) "Plaintiff did not have a protectable property interest in his appointment with the University"; (2) "Plaintiff was not deprived of any due process that was due to him under the Fourteenth

Amendment"; (3) "Plaintiff will not suffer irreparable harm"; (4) "the issuance of an injunction

will cause harm to University students and faculty who have an interest in the University's

enforcement of its employment policies": and (5) the issuance of an injunction "is contrary to the

public interest in prohibiting the misconduct that was the basis of Plaintiff's termination."  Resp.,

DN 22 at 1-2.

In support of its Motion To Stay (DN 31), the University argues that this Court erred

when it found "(1) that Frost had a protectable property interest in his probationary tenure-track

appointment; and (2) that Frost did not receive due process under the Fourteenth Amendment."

DN 31-1 at 7-8.  The University also argues that "the public interest strongly favors granting a

stay," *id.* at 15, and that "the University and its students, faculty and staff, have been and will

continue to be, irreparably harmed." *Id.* at 3.  It also again argues that any harm Frost would

incur should this Court revoke the Preliminary Injunction is "minimal." *Id.*  But  the University

has not shown a likelihood of reversal with respect to any of these grounds because it has not

demonstrated how this Court erred as a matter of law.  Nor has it shown that this Court made any

erroneous factual findings.  Indeed, it cannot because this Court's Memorandum Opinion and

Order for Preliminary Injunction were based upon jointly stipulated facts.  For these reasons, the

University's Motion is unavailing. *Griepentrog*, 945 F.2d at 153.

At the same time, the University has also appealed this Court's decision and seeks

reversal, presenting the same reasons to the Court of Appeals that it has presented to this Court

as grounds for a stay:

> The Court erred in finding that Frost was likely to succeed on the merits of
> his claim because Frost (a) did not have a protectable property interest in
> his probationary tenure-track appointment and (b) received all process due
> to him under the Fourteenth Amendment.  Further, the Court erred
> because Frost was not likely to suffer irreparable harm in the absence of

> an injunction and the public interest does not support the issuance of
> injunctive relief.

06/21/2019 Civil Appeal Statement, Exh. 1.  As result, the same issues are simultaneously before

this Court, albeit for a second time, and before the United States Court of Appeals for the Sixth

Circuit.  Consequently, the University's Motion for a stay improperly asks this Court to entertain

the merits of the pending appeal and to decide the issues.  This Court cannot do that because it

does not have the necessary jurisdiction and because, as the motion truly seeks reconsideration

and reversal, it asks for relief that is not within the scope of this Court's power under Rule 62.

*Gallion*, 534 Fed. App'x 303; *Fort Gratiot*, 71 F.3d 1197; *N.L.R.B.*, 829 F.2d 585; *Coastal

Corp.*, 869 F.2d at 820; *Ortho Phar. Corp.*, 887 F.2d at 464; *Furwa*, 2009 WL 367179 at *5;

*Graveline*, 2018 WL 4184577 at *2; *Geo. S. Hofmeister Family Trust*, 2007 WL 128932 at *2.

**B.  The University has not demonstrated a likelihood of reversal.**

As for the University's repeated arguments on the merits, they have not become winning

arguments simply by virtue of the passage of a few weeks.  Moreover, they are based on

misstatements of the law and misrepresentations of fact. These flaws also support denying the

University's Motion.

**1.  *Ramsey v. Board of Education* is not "binding Sixth Circuit law."[2]**

Just as it did in its Response brief (DN 22 at 12), the University relies on *Ramsey v. Bd.

of Educ.*, 844 F.2d 1268 (6th Cir. 1998) to argue that Dr. Frost cannot bring suit under §1983

because he has no cause of action other than an ordinary breach of contract case.  DN 31-1 at 8-

9.  The University asserts that *Ramsey* is "binding Sixth Circuit law."  *Id.* at 8.  This is not true.

In *Prichard v. Lafferty*, the Sixth Circuit reversed a district court that had relied on *Ramsey* for

the same proposition that the University relies on here.  As well, the Sixth Circuit explained that

---

[2] The University's Memorandum of Law, DN 31-1 at 8.

the language from *Ramsey* on which the district court relied in *Prichard* and on which the

University relies on here is dicta which, of course, is not binding law:[3]

> The district court failed to recognize that Prichard has a property interest created by
> his contract and by statute. The district court relied on *Ramsey v. Board of Educ.,*
> 844 F.2d 1268 (6th Cir.1988), in finding that Prichard's claim merely involved a
> contractual dispute that must be resolved in state court. *Ramsey* involved a teacher
> who brought a section 1983 suit after the Board of Education cut her accumulated
> sick days from 142 to 29. *Id.* at 1269. The *Ramsey* court in dicta noted that a state
> breach of contract action was the appropriate remedy for a person who is hired for a
> fixed period of time or under an at-will contract and then dismissed prematurely. *Id.*
> at 1273. It stated:
>
>> When a person is hired for a fixed period of time or pursuant to a
>> contract providing for employment "at will" or impliedly subject to
>> removal upon the *bona fide* elimination of the position, and that
>> person is dismissed prematurely, no federal cause of action lies
>> under section 1983 to redress what is best characterized as an
>> ordinary breach of contract.
>
> *Id.* That dictum in *Ramsey,* however, was directed not toward the right but toward
> the remedy, and acknowledged that a nontenured employee had a property interest
> in employment for the duration of the employment contract. *Id.* And, in any case,
> Prichard had a property right created by Kentucky statute as well as by a contract
> for a definite period of time, and therefore this case presents a different situation
> from that described in dicta in *Ramsey.*

*Prichard*, 974 F.2d 1338, n.3 (6th Cir. 1992).  *Prichard* makes clear that *Ramsey* is not binding

law which this Court failed to follow.  Indeed, *Prichard* shows that this Court did not err at all.

Glenn Prichard filed a §1983 suit after the Marion County Board of Education fired him

for misconduct.  He claimed violations of his substantive and procedural due process rights.  *Id.*

at 1338.  Reversing the district court, the Sixth Circuit explained:

> Prichard had a property interest in his employment that was created by his four-
> year contract. The Board deprived Prichard of this interest by first suspending him
> (although with pay) and then removing him before the end of his four years. In
> addition, Prichard had a property interest created by Ky.Rev.Stat. § 160.350,
> which permitted a Board to remove a superintendent only "for cause." This statute
> created an entitlement not to be removed but for cause. *Cleveland Bd. of Educ. v.*

---

[3] *Slusser v. U.S.*, 895 F.3d 437, 440 (6th Cir. 2018) ("We generally treat *dicta* as non-binding.") (citing *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 737-38 (2007)); *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006) ("dicta does not bind this Court.")

> *Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491 (1985) (Ohio statute
> prohibiting dismissal except for misfeasance etc. created property right). Thus,
> before Prichard could be deprived of those property rights, he was entitled to due
> process of law.

*Id.*   The same is true here. Dr. Frost has a protectable property interest in his contract of

employment.  He also has a property interest created by statute, KRS 164.830, which provides

that he may only be terminated for cause:  "no president, professor, or teacher shall be removed

except for incompetence, neglect, or refusal to perform one's duty or for immoral conduct."

KRS 164.830 (1)(b).  Thus, like Prichard, Dr. Frost had a property right created both by contract

and by Kentucky statute, which also means that Dr. Frost's case "presents a different situation

from that described in dicta in *Ramsey.*" *Prichard*, 974 F.2d at n.3. Neither of these facts has

changed.  Indeed, the University has renewed Dr. Frost's contract for the 2019-2020 academic

year.  *See* Renewal Letter, Exh. 2.[4]  Also, the University has again ignored KRS 164.830(b)(1).

The University's remaining property-interest argument is illogical.  It argues that Dr.

Frost "had a vested contractual right" but "not a constitutionally protected interest."  DN 31-1 at

8.  This is a non sequitur.  A contract creates a constitutionally protected property right.

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004) (property interest can

be created by statute, formal contract or implied contract).  Moreover, that property right is

protected by due process:  "college professors and staff members dismissed during the terms of

their contracts have interests in continued employment that are safeguarded by due process." *Bd.*

*of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-77 (1972).  A professor need not be

tenured to have a constitutionally protected property interest.  *Id.*  For this reason, this Court did

not err when it held that Dr. Frost had a constitutionally protected property interest.

---

[4] The letter, however, gets the term wrong.  In accordance with his appointment, Frost's work year runs from July 1, to June 30.  Regrettably, the University has not returned Dr. Frost to the status quo.  Instead, its has retaliated against Dr. Frost in various ways.

Further and contrary to the University's argument, Redbook §4.5.2 does not permit the opposite conclusion.   While §4.5.2 may operate to circumscribe the duration, or extent, of a University tenure-track professor's property interest in his or her contract of appointment, it does not alter the fundamental nature of the property interest itself or its constitutional protection. This conclusion is plain from the language of §4.5.2.   First, §4.5.2 requires the University to provide notice of non-renewal "in advance of the expiration of the appointment," and, at the same, it establishes "minimum periods of notice."   In this way, §4.5.2 not only implicitly recognizes that a tenure-track professor has contractual rights, it also guarantees additional continued, contractual employment for a term of either ninety days, six months, or one year following a notice of non-renewal.   In this way, §4.5.2 itself creates and confers a property interest that is constitutionally protected.   *Singfield.*, 389 F.3d at 565 (property interest can be created by "a contract implied from the circumstances.").   Indeed, §4.5.2 creates one of the most significant property interests that an individual can have: a professor's means of livelihood. *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1348 (6th Cir. 1992) ("The Supreme Court has held repeatedly that the property interest in a person's means of livelihood is one of the most significant that an individual can possess.").

Moreover, the University is wrong to assert that §4.5.2 permits it to fire a professor, including Dr. Frost, "for no reason whatsoever." DN 31-1 at 8.  To the contrary, §4.5.2 expressly states that the University must provide the reasons for any non-renewal decision in writing upon request:  "If the faculty member so requests, the professional, academic, budgetary, management, planning or other factors given in explanation of the nonrenewal ***will be*** confirmed in writing." REDBOOK, §4.5.2 (emphasis added) (Exh. 3). That is, §4.5.2 contemplates that the University

must have reasons for not renewing a tenure-track professor's appointment and cannot simply issue notice of non-renewal "for no reason whatsoever."

The falsity of this contention is also demonstrated by the University's recent conduct. Despite this Court's order that it must fully reinstate Dr. Frost to the status quo, the University conditioned his return to his lab on first meeting with Assistant Dean Deborah Keeling. The University was able to enforce this condition because the locks had been changed. When asked for the purpose of the meeting, the University, by counsel, said it was to "touch base." To the contrary, Dr. Keeling's sole purpose was to present Dr. Frost with a notice of non-renewal authored by defendant Dean Kempf-Leonard. *See* Exh. 4. Pursuant to §4.5.3 of the REDBOOK, Dr. Frost asked for the Dean's reasons. On June 21, 2019, the Dean authored a second letter setting for her reasons, albeit untrue and pre-textual reasons, and sent it to Dr. Frost by certified mail. Dr. Frost is grieving that retaliatory decision. *See* Exh. 5. This conduct begs the question. If neither the Dean nor the University were required to have any reason or reasons for non-renewal, why bother to invent them?

Next, the University contends defendant Dean Kempf-Leonard's January 28, 2019 termination letter constituted a notice of non-renewal after the 2019-2020 academic year. DN 31-1 at 10. The letter's first sentence alone disproves any such assertion: "This letter serves as the notice of my written recommendation to terminate your appointment as Assistant Professor of Biology in the Department of Biology, College of Arts & Sciences effective June 30, 2019." DN 21-18 at 1. The dean simultaneously divested Dr. Frost of all of his job duties, deemed him *persona non gratis*, and banned him from campus. None of this conduct is consistent with the procedure set out in § 4.5.2 of the REDBOOK. Accordingly, this Court was correct when it found that "[t]he University unmistakably terminated Frost before the end of his 2018-2019

appointment term pursuant to Section 4.5.3 of the *Redbook*." DN 26 at 13. Simply put, termination of an appointment is not synonymous with non-renewal. The REDBOOK alone proves this point as it devotes separate sections to each circumstance and imposes entirely different requisites and procedures. *Cf.* REDBOOK §4.5.2 with §4.5.3.

Finally, the University's continued reliance on *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135 (6th Cir. 1997) remains unavailing. Jane Bailey waived the argument that her appointment letter created a one-year contract that gave rise to a protectable property interest. 106 F.3d at 143. With no other source of a protectable interest, the court held that she had "no contractual right to continued employment" and thus no property interest. *Id.* at 144. The opposite is true here. Dr. Frost's appointment letter, signed by him, created a contract that gave him a property interest in the right to be considered for tenure no later than year 2020-21. Even under the University's arguments, his appointment had been renewed for academic year 2018-2019. DN 22 at 7. It is indisputable that the Dean fired Dr. Frost during the term of his contract.

### 2. The University's attempt to distinguish *Doe v. Baum* has no merit.

The University argues that *Doe v. Baum*, 903 F.2d 575 (6th Cir. 2018) does not apply here because defendant Dean Kempf-Leonard's termination decision did not depend upon the finding of sexual harassment but upon "unwanted physical conduct" to which Dr. Frost supposedly admitted. Nowhere has Dr. Frost admitted to "unwanted physical conduct" or to "unwelcome physical conduct." He certainly has not "confess[ed] to physical misconduct with a student." DN 31-1 at 12. Beyond that, the conclusion that holding Doe's hair back and touching her back was "unwanted" or "unwelcome" depends upon believing Doe. That is, it is a credibility determination. So even if one adopts the University's distorted characterization of the dean's January 28, 2019 letter, its argument fails.

As for the actual contents of the January 28, 2019 letter, it accused Dr. Frost of having engaged in "immoral conduct" and "[e]ngaging in unwelcome, inappropriate physical conduct toward a student, which resulted in the student's departure from your class and/or lab."  DN 21-18 at 2.  Plainly, the dean took direct action based upon the sexual harassment finding.  The University's effort to recast the letter's language simply rings hollow.  It is belied by the record.  Indeed, just as Dr. Frost has never admitted to unwelcome or unwanted physical conduct, he has never admitted to serving alcohol to an underage student whom he knew or should have known was underage.  Yet, the Dean rested her termination decision on that accusation too:  "Providing alcohol to and/or consuming alcohol with an underage student enrolled in one of your classes and/or working in your lab" and  "engaging in consumption of alcoholic beverages with students, including those you knew and/or should have known were under the legal drinking age." DN 21-18 at 2.

Extraordinarily, the University also argues that the facts that underlay the Case Summary Report are somehow undisputed because Dr. Frost did not provide contradictory evidence.  DN 31-1 at 13.  In this remarkable manner, it continues to whistle past the graveyard.  The Due Process Clause requires notice of the substance of the allegations and an explanation of the employer's evidence at the outset so that the accused has a meaningful opportunity to rebut that evidence.  *Loudermill*, 470 U.S. at 542; *Morrison v. Warren*, 375 F.3d 468, 473-75 (6th Cir. 2004).  The University did not provide meaningful notice and certainly did not inform Dr. Frost of the evidence it had gathered against him in advance of his interview.  Defendant Schroeder's November 7, 2018 email did not do so and no other notice was given to Dr. Frost in advance of his interview so as to permit him to "identify additional witnesses," produce affidavits, and provide documentation "that contradicted the conduct that was the basis of the Case Summary

Report and Dean Kempf-Leonard's letter." DN 31-1. Because the University failed to provide him with adequate notice and he did not know what had been alleged or what evidence had been gathered, Dr. Frost had no means of knowing what he needed to rebut much less a means by which to identify rebuttal witnesses and documents. This is exactly how the University violated Dr. Frost's right to due process with respect to notice.

### 3. The University's notice argument is contrary to law.

The University argues that it provided sufficient notice to Dr. Frost in advance of his interview. DN 31-1 at 13. Tellingly, they do not cite to the November 7, 2018 notice given to him by Schroeder; rather, they rely on language from defendant Dean Kempf-Leonard's termination notice. *Id.* Schroeder's notice said only that Dr. Frost "hosted a potluck in the summer in which students were invited"; "alcohol was served" and "inappropriate touching occurred." Jt. Stip. of Fact, DN 19 at ¶ 13. Contrary to the University's brief, the notice did not state that students "did in fact consume alcohol." DN 31-1 at 13. It did not state that Dr. "Frost provided Doe alcohol." *Id.* Nor did the notice state that "Frost engaged in unwelcome physical conduct with Doe." *Id.* In no way did defendant Schroeder notify Dr. Frost of "***these three exact factual allegations***." *Id.* at 14 (emphasis in original). Indeed, this assertion is disproven by the University's quotation of the notice in their very next sentence. *Id.* It is also true that Does' allegations were much more specific and, thus, consisted of substantive claims that were never provided to Dr. Frost in advance, which is evident from the Case Summary Report's recitation of her allegations.

The University's reliance on *Devlin v. Kalm*, 531 Fed. App'x 697 (6th Cir. 2002) does not help them. Contrary to what the University did here, the defendants in *Devlin* provided Mr.

Devlin with the specific allegations and a list of the policies he allegedly violated **before** the

investigatory conference and before they terminated his employment:

> The notice told him he would be asked "questions related to your involvement
> and conduct in the access and release of confidential information, failure to follow
> the chain of command, insubordinate behavior, [and] disrespectful conduct." The
> letter also listed the various department policies he had been accused of violating
> and invited him to bring counsel to the conference.

*Id.* at 708.  Nor does *Bramley v. Knudson*, 917 F.2d 1304 (Table), 1990 WL 169661 (6th Cir.

1990) help the University.   He too was put on notice of specific allegations before being

terminated:

> Bramley's tenure with the City of Willoughby was stormy. He was accused of
> citing an auto body repair shop for nonexistent violations of the electrical code in
> order to "get even" with the owner. He was also accused of being rude to the
> public. For example, he told the owner of a business in Willoughby that "[i]t
> would be a cold day in hell before you open Monday." Bramley's supervisor,
> Gene Barnes, believed that Bramley had lied to him when Bramley denied saying
> this to the business owner. Bramley denies these accusations. He was also accused
> of using profanity around the office, and of speeding in a city-owned inspection
> vehicle.
>
> Based on these occurrences, and Bramley's general unwillingness to extend his
> expertise beyond electrical inspection, Barnes met with Bramley approximately
> one month before his termination. Barnes stated that he advised Bramley of the
> accusations. Barnes also stated that he advised Bramley that he believed both the
> accusations and that Bramley's performance was unsatisfactory. Barnes stated that
> he reminded Bramley that he was still on probationary status and informed him
> that he would have to improve his performance.

*Id.* at *1.  Plainly, the defendant in *Bramley* had provided the plaintiff with detailed notice and it

contradicts the University's assertion that such detail was not required.

Indeed, the Sixth Circuit found that "[i]n light of Barnes's detailed statements to Bramley

regarding the specific deficiencies in her performance, Bramley cannot credibly claim to have

been surprised by the reasons behind his termination." *Id.* at *4.   That is, Bramley had received

oral notice "of the charges against him" and an "explanation of the employer's evidence," which

is what *Loudermill* requires.  470 U.S. at 546.  The same is not true for Dr. Frost.  The University never provided him with the substance of Doe's allegations or the nature of any other evidence gathered against him.  The record in this case does not allow for a different conclusion.

Next, the University argues that by not participating in post-deprivation procedures, Dr. Frost has waived any procedural due process claim.  "But the failure to use post-termination procedures does not waive a due process claim where the pre-termination procedures are inadequate."  *Stevens v. Speck*, 2016 WL 5745108 at *5 (E.D. Ky. Sept. 30, 2016) (citing *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004)).  For this reason, *Farhat*, on which the University relies for its waiver argument does not help them.

Indeed, *Farhat* acknowledges that "prior to termination of a public employee who has a property interest in his employment, the due process clause requires that the employee be given 'oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer."  370 F.3d at 595.  The failure to provide sufficient pre-termination process in and of itself violated Dr. Frost's constitutional right to due process and thus in and of itself inflicted irreparable harm.  In short, the "'root requirement' of the Due Process Clause" is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."  *Loudermill*, 470 U.S. at 542 (emphasis in original).  Here, defendant Dean Kempf-Leonard terminated Dr. Frost, depriving him of his protectable property interest with his having been given sufficient notice and a meaningful opportunity to be heard.  His right to due process was violated and he was irreparably harmed as a result.  *Id.; Overstreet v. Lexington-Fayette Urban Cnty. Gvt.*, 305 F.3d 566 (6th Cir. 2002) (violation of a constitutional right standing alone is irreparable harm).

Moreover, when a deprivation of property occurs pursuant to an established procedure, then "it is both practicable and feasible for the state to provide pre-deprivation process, and [it] ***must do so regardless of the adequacy of any post-deprivation remedy.***" *Walsh v. Cuyahoga Cnty.*, 424 F.3d 510, 513 (6th Cir. 2005) (emphasis added); *accord Moore v. Bd. of Educ. of Johnson City Sch.*, 134 F.3d 781 (6th Cir. 1998); *Roth*, 408 U.S. at 569-70 (when protected interest is implicated right to ***prior*** hearing is paramount") (emphasis added).

**4.  The harm to Dr. Frost was not "minimal."**

The University argues that Dr. Frost was not deprived of due process because any harm to him was "minimal."  DN 31-1 at 15.  It asserts that this Court found the harm to Dr. Frost was "minimal."  *Id.*  The contrary is true. This Court made no such finding, and *Overstreet*, 305 F.3d 566, makes plain that a violation of a constitutional right is irreparable harm.  *Id.*  The University ignores *Overstreet*, and *Estep v. City of Somerset, Ky.*, 2011 WL 845847 (E.D. Ky. Mar. 8, 2011) on which it relies is of no help.  First, *Estep* does not stand for the proposition that deprivation of required due process is "minimal harm."  Second, it was in the context of reprimands that the district court in *Estep* addressed whether the process provided was adequate.  Third, it is clear from *Estep*, that the employee was given adequate notice of the specific charges against him and a meaningful opportunity to rebut them. Fourth, the deprivation here was of Dr. Frost's livelihood and is not analogous to reprimands.  The University terminated his employment.  That is a serious harm and is no way "minimal." "The Supreme Court has held repeatedly that the property interest in a person's means of livelihood is one of the most significant that an individual can possess."  *Sutton*, 958 F.2d at 1348.

**5. The University's public interest argument is without merit.**

The University's public interest argument is self-defeating.  It states:  "[t]he public has an interest in preventing sexual harassment and in allowing the University to make personnel decisions, so long as those personnel decisions do not violate the law."  DN 31-1 at 15 (citation omitted).  Here, the University's "personnel decision" violated the most important of laws, constitutional law.

**6. The University's irreparable harm argument is contrary to fact.**

At the same time that the University argues that it took no action based on the sexual harassment finding, it argues that it will be irreparably harmed by this Court's interference with its ability to protect its students' safety.  DN 31-1 at 3.  Even if this self-contradiction is set aside, accusations are not proof, of course, and there has been no reliable finding that Dr. Frost is guilty of sexual harassment.  Even the University's arguments disavow the finding.  Indeed, the University cannot do otherwise.  The sexual harassment finding is inherently unreliable because it is based on an unfair process that omitted the means of discovering the truth: cross examination.  Even so, the investigators were unable to confirm that any sexual misconduct took place. Apparently determined to find guilt, they reached a conclusion that simply ignored the University's own definition of what constitutes sexual harassment.

The University's argument is flawed for a second reason: it is unsupported by any evidence.  It contends that "students have already communicated to the University that they are not comfortable working with Frost."  But there is no affidavit or other proof of this contention.  At the same time, the University states that it has made alternate arrangements so that these students will have no contact with Dr. Frost.  Again, if this is true, then there is no harm in fact.  Further, the University's supposed concern for student safety is belied by the fact that it has

asked Dr. Frost to teach two large-enrollment classes, Biology 102 in the Fall and Biology 242 in the Spring.  Biology 242 is a required course for Biology majors.  Class Schedule, Exh. 6.[5]

Nor is there any evidence or proof for the contention that this Court's decision will have a chilling effect.  DN 31-1 at 4.  This argument is nothing but speculation.  Moreover, the Court's decision should promote confidence in students and faculty alike that the University will be required to conduct fair investigations, ones that provided both the accuser and the accused with due process.

The University contends that this Court's Preliminary Injunction leaves students wondering if their complaints will lead to lawsuits.  *Id.*  The opposite is true. This Court's decision provides instruction as to how a lawsuit may be avoided by explaining what due process requires and thereby providing guidance and clarity.

Next, the University presupposes that students "may never make complaints of sexual harassment" because they may be subject to cross examination.  Again, this is pure speculation.  Moreover, this proposition turns core constitutional law on its ear by suggesting that it would be proper to do away with fundamental fairness and the best means of uncovering the truth.  *Baum,* 903 F.2d at 581 (cross examination "is the greatest legal engine ever invented for uncovering the truth").  It is equally untrue that this Court's ruling puts professors "into a position where they can intimidate and threaten students further."  To the extent the University is suggesting that Dr. Frost has engaged in any such conduct, there is no proof of it and his excellent student evaluations contradict any such assertion.  *See e.g.* DN 21-12.  Also, this Court's equally forewarns faculty members that they too will be subject to rigorous cross-examination, and in now way absolves them of their obligation to behave lawfully.

---

[5] The Schedules can be found at https://htmlaccess.louisville.edu/classSchedule/searchClassSchedule.cfm.

Nor does this Court's Preliminary Injunction prevent the University from investigating sexual harassment complaints. This contention must be rejected outright.  This Court's order required only that its investigation comply with due process.  The University's remaining irreparable harm arguments comprise little more than an admission that it will not be returning Dr. Frost to the status quo as if that were somehow impossible in a University setting.  DN 31-1 at 5-6.  Registration is open. Dr. Frost can be assigned to the courses he has routinely taught (not Biology 102 and 242) and otherwise resume his lab work.  Any NSF funds improperly spent or other funds of which he has been deprived can be refunded to him.  There is nothing preferential about returning the parties to business as usual.

## CONCLUSION

This Court entered its Order For Preliminary Injunction based on jointly stipulated facts and settled federal law.  The University has not demonstrated that this Court made any error of law and certainly not any error of fact.  Thus, it has failed to demonstrate the "likelihood of reversal" necessary to its requested relief. *Griepentrog*, 945 F.2d at 153.  Additionally, the University's Motion improperly seeks reconsideration and reversal, relief that this Court may not grant in light of the University's appeal which seeks the same relief.  *See supra* at 2-6.  For these reasons, Dr. Frost respectfully seeks the entry of an order denying the University's Motion to Stay this Court's Preliminary Injunction.

Respectfully submitted,

Mary E. Eade
Nemes Eade PLLC
P.O. Box 43757
914 Lily Creek Rd., Suite 202
Louisville, Kentucky 40243
(502) 792-0350
*meade@nemes-eade.com*

-and-

R. Gregg Hovious
Loren T. Prizant
Matthew P. Dearmond
MIDDLETON REUTLINGER
401 South 4th Street, Suite 2600
Louisville, KY  40202
(502) 584-1135
*ghovious@middletonlaw.com*
*lprizant@middletonlaw.com*
*mdearmond@middletonlaw.com*

*Counsel for Plaintiff, Dr. Christopher Frost*